**IN THE SUPREME COURT OF TENNESSEE
AT KNOXVILLE**

FILED

**April 7, 1997**

Cecil Crowson, Jr.
Appellate Court Clerk

FOR PUBLICATION

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | **Filed: APRIL 7, 1997** |
| | ) | |
| Appellee, | ) | CUMBERLAND COUNTY |
| | ) | |
| v. | ) | Hon. Leon Burns, Jr., |
| | ) | Judge |
| MICHAEL DEAN BUSH, | ) | |
| | ) | |
| Appellant, | ) | Supreme Court |
| | ) | No. 03-S01-9604-CC-00047 |

FOR APPELLANT:

Martelia T. Crawford
Cookeville, Tennessee

Richard McGee
Nashville, Tennessee

FOR APPELLEE:

John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Gordon W. Smith
Associate Solicitor General

Amy L. Tarkington
Assistant Attorney General
Nashville, Tennessee

William Edward Gibson
District Attorney General

Owen G. Burnett
John A. Moore
Lillie Ann Sells
David A. Patterson
Asst. District Attorneys General
Cookeville, Tennessee

# O P I N I O N

TRIAL COURT AND
COURT OF CRIMINAL APPEALS AFFIRMED.                    DROWOTA, J.

In this capital case, the defendant, Michael Dean Bush, was convicted of

premeditated first degree murder and first degree burglary.[1]  In the sentencing

hearing, the jury found two aggravating circumstances: (1) "[t]he murder was

especially heinous, atrocious or cruel in that it involved torture or serious physical

abuse beyond that necessary to produce death;" and (2) "[t]he murder was

committed for the purpose of avoiding, interfering with or preventing a lawful arrest

or prosecution of the defendant or another."  Tenn. Code Ann. § 39-13-204(i)(5)

and (6) (1991).  Finding that the two aggravating circumstances outweighed

mitigating circumstances beyond a reasonable doubt, the jury sentenced the

defendant to death by electrocution.

On direct appeal to the Court of Criminal Appeals, the defendant

challenged both his conviction and sentence, raising nineteen claims of error,

each with numerous subparts.  After fully considering defendant's claims, the

Court of Criminal Appeals affirmed the trial court's judgment.  Thereafter, pursuant

to Tenn. Code Ann. § 39-13-206(a)(1) (1996 Supp.),[2] the case was docketed in

this Court.

The defendant raised numerous issues in this Court, but after carefully

examining the entire record and the law, including the thorough opinion of the

Court of Criminal Appeals and the briefs of the defendant and the State, this

---

[1]Although not relevant to this appeal, the trial judge imposed a three-year sentence concurrent to the death penalty for the burglary conviction.

[2]"Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the Court of Criminal Appeals.  The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee Supreme Court.  Upon the affirmance by the Court of Criminal Appeals, the clerk shall docket the case in the Supreme Court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure."

Court, on October 14, 1996, entered an Order limiting review to seven issues and setting the cause for oral argument at the January 1997 term of Court in Knoxville. See Tenn. S. Ct. R. 12.[3]

For the reasons explained below, we have determined that none of the alleged errors affirmatively appear to have affected the verdict of guilt or the sentence imposed. Moreover, the evidence supports the jury's findings as to aggravating and mitigating circumstances, and the sentence of death is not disproportionate or arbitrary. Accordingly, the defendant's conviction for first degree murder and sentence of death by electrocution are affirmed.

## FACTUAL BACKGROUND

The defendant was convicted of the premeditated murder of Jodie Lefever, a seventy-nine-year-old widow who lived alone in her home in the Silver Point community of Putnam County.[4] The evidence presented at the guilt phase of the trial established that Lefever's body was discovered by a neighbor on August 19, 1988, lying face down on the floor in her den next to the side door of the house. She had been stabbed numerous times. A large amount of blood was on her back, her head and the floor. Blood was also splattered on the door and nearby wall. Two holes of unknown origin were in the wall near Lefever's body.

---

[3]Tennessee Supreme Court Rule 12 provides in pertinent part as follows: "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it will review. Selection of such issues will be based on the criteria of T.R.A.P. 11(a)." This is the first capital case using this new procedure.

[4]Although the crime occurred in Putnam County, Bush was tried in Cumberland County following the trial court's grant of his motion for a change of venue.

Investigating officers found a piece of pressure-treated wood on the floor next to the den sofa and another piece of pressure-treated wood behind the television set in the same room. Officers also found drops of blood on a chair in the den, on the utility room floor leading from the den to the kitchen, on the kitchen floor, and on a rug in the hallway leading to the bedroom. One drawer in the bedroom dresser was open. The front door and windows of the house were locked, and there was no sign of forced entry. The house and its furnishings were essentially undisturbed. The only item missing from the house was a butcher knife that was kept in a drawer next to the kitchen sink.

Dr. Gretel Harlan, assistant medical examiner with the State Medical Examiner's Office, testified that Lefever died as a result of being stabbed forty-three times. The wounds extended down the left side of her face, down the back of her neck, across her shoulders, and down her back. They were consistent with wounds inflicted by a butcher knife like that taken from the kitchen. Several of the wounds were fatal and had passed through Lefever's back and penetrated various vital organs and blood vessels. The location of the injuries indicated that Lefever had probably been lying down during the attack. All the wounds had been made while Lefever was alive; but it was impossible to determine the order in which they had been inflicted. Some wounds would have resulted in unconsciousness in three to five minutes. However, if other wounds had been inflicted first, Lefever could have been alive and conscious for twenty to thirty minutes. Because the stab wounds did not damage Lefever's central nervous system, it was possible, according to Dr. Harlan, that Lefever felt the wounds as they were inflicted, a sensation that Dr. Harlan compared to undergoing surgery without anaesthetic. In

addition to the stab wounds, there were two small "scrape areas" on the victim's left knee and elbow consistent with a fall onto those parts of her body before collapsing to the ground. Lefever's left collarbone had been bruised either shortly before the stabbing or during the fall. Contusions found around her eyes could likewise have been inflicted before she fell or could have resulted from one of the stab wounds that had penetrated the left eye.

Despite extensive investigation, law enforcement officials had no suspects on September 25, 1988, when Putnam County Sheriff Jerry Abston was notified by his office that eighteen-year-old Michael Dean Bush and his father were at the Sheriff's office and had information regarding Lefever's murder. Lefever had been the best friend of the defendant's grandmother, and Bush had mowed Lefever's lawn and helped her get groceries. In a series of statements recorded at the Cookeville police department and played for the jury at trial, Bush told law enforcement officers that on the afternoon of August 16, 1988, while he was living at his mother-in-law's trailer, he received a telephone call to go to the Silver Point community after dark, if he ever wanted to see his family again. After calling his parents' house and receiving no answer, the defendant concluded something was wrong.

Later that evening, after dark, the defendant instructed his wife to drive him to an area near Lefever's house. When his wife asked him what was going on, he told her that they "needed some money . . . and [he] was going to go rob the old woman that lived down there." After his wife dropped him off and left, Bush said he was met by four men wearing black ski masks. One pulled a gun on him and

said that they "needed somebody Jodie trusts." Bush said Lefever was on the telephone when he knocked on her side door. After Bush identified himself, Lefever unlocked the door. The men then pushed him inside the house and began to hit Lefever so hard that she fell back and hit the wall with her elbow. One of the men ran through the kitchen and the rest of the house. When the stick being used to beat the victim broke, the men quickly gathered the pieces and handed them to Bush and told him to go outside. A few minutes later the men came out and gave the defendant a knife. The defendant's hand was cut by the blade as he took the knife. The men instructed Bush to "take the stuff and get rid of it" and forget everything he had seen. As Bush was walking to meet his wife, one of the men drove up beside him and said "loose lips sink ships."

Shortly afterward the defendant's wife picked him up. He was crying and had blood all over him. When his wife asked him what had happened, he said, "I killed Jodie." They drove to Center Hill Lake, where he threw the knife and the pieces of the broken stick into the water and washed himself off. Bush then told his wife that he had not killed Lefever but blamed another man, Jackie Maxwell.

On the same day and approximately the same time as Bush was giving his statements to law enforcement officials at the Cookeville police department, his seventeen-year-old wife, Sheila Bush, made several statements to officers at the Putnam County sheriff's office. She testified to the substance of those statements at trial. While most of her story matched that of the defendant's, it was different in one vitally important aspect. Shelia Bush incriminated the defendant as the sole perpetrator of the offense. According to Sheila Bush, on the evening of August

16, 1988, the defendant told her that they needed money and that he knew "a woman he could knock in the head and get some money," but he would not tell Shelia Bush the name of the woman nor the location of her home. The defendant removed a piece of wood from the frame around his wife's bedroom door and directed his wife to drive him to an area in the Silver Point community. Once there, he got out of the car and told her to come back in twenty minutes. After driving to Center Hill Dam, Shelia Bush returned to find the defendant standing in the road. He had his shirt off and was covered with blood. As he got into the car, he excitedly told his wife that he had "killed her." The defendant said he had "stabbed her with a knife" and that he had cut his hand wide open. At the defendant's directions, Sheila Bush drove to a boat ramp near the dam, where the defendant threw his shirt, some pieces of wood, a knife and a pair of sunglasses into the lake. He then washed off the blood that was on him.

The next day, according to Sheila Bush, the defendant told her how he had killed Lefever, how he knocked on the door as the victim spoke on the phone, how she let him in once she recognized him, and how he had struck her in the head with the stick and caused her to fall. The defendant said that the victim told him to "get a hold of himself." When Lefever indicated that there was someone in the back of the house, the defendant searched the house. Finding no one there, he removed his shirt, wrapped it around his hand, and as he came back through the kitchen, took a knife out of the kitchen drawer. He took the knife into the den and stabbed Lefever thirty or forty times. The defendant demonstrated how he had killed Lefever by having his wife lie on her stomach on the floor as he pretended to stab her in the head and the back. The defendant, a karate student and

enthusiast, also told his wife that he practiced karate on Lefever. The next instant, however, he told his wife that he was "just kidding" and that Jackie Maxwell had killed Lefever. Sheila Bush explained that she had not reported this information earlier because the defendant told her that the Mafia was watching her and that something would happen if she mentioned anything.

Physical evidence supported the statement of Sheila Bush. Going to the spot where the defendant had allegedly thrown away the murder weapon, Tennessee Bureau of Investigation (T.B.I.) divers recovered a knife from the waters of Center Hill Lake. Lefever's grandson identified the knife as one his grandmother kept in a drawer next to the kitchen sink. A forensic scientist, who had analyzed the two pieces of wood discovered in Lefever's den, testified that they came from the top of a bedroom door in the trailer belonging to Sheila Bush's mother. A T.B.I. serologist testified that the blood found on the rug in the hallway and kitchen floor was consistent with that of the defendant. Only two percent of the Tennessee population have this blood-type.

Other witnesses tied the defendant to the killing. James Mullins, a friend of the defendant, testified that on the day after Lefever's body was found, the defendant brought a newspaper reporting the discovery of the body to Mullins' house. The defendant was excited and grinning, "all wound up like a kid that had too much Kool-Aid." Two of defendant's fellow inmates at the Putnam County jail, Jimmy Myers and William Roger Moore, testified that the defendant told them he had killed the victim. According to Myers, the defendant said that his wife had taken him to Lefever's house to borrow or get some money and, when the

-8-

defendant could not find any money, he stabbed Lefever to death. After this first account, however, the defendant kept changing his story because, the defendant said his lawyers had told him that people in the jail might be witnesses against him. The defendant also told Myers that he would try to make people think he was crazy. The second inmate, William Roger Moore, testified that the defendant discussed the crime "at length" with him. The defendant said that he had gone to Lefever to get some money because he had borrowed money from her in the past. An argument erupted, he lost his temper, and stabbed her repeatedly with a knife he had taken from the kitchen. The defendant also told Moore that he was "going to make a ploy for craziness."

The defendant did not testify nor did he offer any evidence at the guilt phase of the trial. Based on the proof presented at the guilt phase, the jury found Bush guilty of premeditated first degree murder.

The State presented no additional proof during its case-in-chief at the sentencing phase of the trial, but instead relied upon the evidence presented during the guilt phase.

Through the videotaped deposition testimony of his grandmother and the live testimony of his father, sister, and uncle, the defendant presented evidence of his childhood and alleged mental illness. The defendant was the second of three children. His father, a Vietnam War veteran, was a truck driver, who abused alcohol and was away from home for long periods of time when the defendant was young. His father physically abused the defendant's mother and singled out the

defendant, who was particularly strong-willed, for strict discipline, beatings and whippings. The defendant was placed on Ritalin, a medication for hyperactivity, at a very young age. At the age of three or four, he began sniffing gasoline. At the age of ten, he seriously injured his head in a bicycle accident. Afterwards, his personality seemed to change; he became nocturnal, distant and quick tempered. He was involved in fights at school. He expressed the wish to die, heard voices, suffered from nightmares, drew pictures of demons and monsters and became fascinated with death and twins. In 1987 the defendant dropped out of high school before completing his senior year. In March of 1988, his mother was diagnosed with terminal colon cancer. In May and June of 1988, he attempted suicide by overdosing on Tylenol and Advil. At that time he was referred to the Plateau Mental Health Center for treatment.

Following his arrest in September of 1988, the trial court, upon the request of his court appointed attorney, referred the defendant to the Middle Tennessee Mental Health Institute (M.T.M.H.I) for a competency and sanity evaluation. Three members of the evaluation team, a social worker, Rebecca Jane Smith, Dr. Gillian Blair, a clinical psychologist, and Dr. John Cain, a psychiatrist, testified that they had diagnosed the defendant as suffering from schizophrenia paranoid subtype sub chronic, an adjustment disorder, and substance abuse (inhaling solvents). Dr. Blair opined that the schizophrenia had begun before the defendant's admission to M.T.M.H.I. Dr. Cain said that the defendant had shown symptoms of schizophrenia beginning in high school. The evaluation team administered tests to determine whether Bush was malingering. Dr. Blair administered an "M" test, the results of which indicated that Bush was

schizophrenic and not malingering. In addition, Dr. Cain administered sodium amitol, popularly known as truth serum. According to Dr. Cain, under the influence of that drug, Bush's psychotic symptoms became even more pronounced which indicated that Bush was not malingering. The Wexler Adult Intelligence Test showed that the defendant had a full scale I.Q. of 96.

In rebuttal the State presented two members of the M.T.M.H.I treatment team who had worked with the defendant from May to August of 1991 when he was again admitted for treatment and evaluation. One of these, Dr. Zillur Athar, a psychiatrist, testified that the defendant was not actively psychotic at that time but malingering. Dr. Athar diagnosed defendant as suffering from borderline personality disorder. Edean Gerdes, coordinator for the treatment ward, said that she had observed the defendant reading books about vampires, which he said had been given to him by his lawyers.

The State also presented a deputy with the Putnam County sheriff's department who had transported the defendant to mental health institutions on several occasions. He testified that in 1989 the defendant told him "some of the doctors were easy to fool." At a later time, the defendant told the deputy that a lot of the doctors were foreigners and asked silly questions. The defendant's former mother-in-law testified that in 1988, when the defendant was married to her daughter, he was normal, intelligent and quick tempered. She had never observed any bizarre behavior on his part. A high school friend of the defendant testified that Bush had been a normal, happy person. On cross-examination, however, he admitted telling the assistant district attorney in 1989 that in 1988 the

defendant had begun to act strangely and talked about dreams of men killing people in the Silver Point area.

Based on the proof, the jury determined that the State had proven the existence of two aggravating circumstances beyond a reasonable doubt (1) "[t]he murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death;" and (2) "[t]he murder was committed for the purpose of avoiding, interfering with or preventing a lawful arrest or prosecution of the defendant or another." Tenn. Code Ann. § 39-13-204(I)(5) and (6) (1991). In addition, the jury found that the aggravating circumstances outweighed the mitigating circumstances[5] beyond a reasonable doubt and, as a result, sentenced the defendant to death by electrocution. The trial court entered a judgment in accordance with the verdict and the Court of Criminal Appeals affirmed. After reviewing the record and considering the errors

---

[5]The jury was instructed to consider the following mitigating circumstances:
(1)The defendant has no significant history of prior criminal activity;
(2) The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance. Extreme mental or emotional disturbance is a temporary state of mind so enraged, inflamed or disturbed as to overcome one's judgment and to cause one to act from the compelling force of the disturbance rather than for evil or malicious purposes. It is not a mental disturbance in itself and an enraged, inflamed or disturbed emotional state does not constitute an extreme emotional disturbance unless there is a reasonable explanation or excuse for it;
(3) The youth of the defendant at the time of the crime;
(4)The capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was substantially impaired as a result of mental illness or defect or intoxication which was insufficient to establish a defense to the crime but which substantially affected his judgment;
(5)The defendant was subjected to physical and/or psychological abuse or cruelty during his formative years;
(6)That the defendant has considerable poetic abilities;
(7)That the defendant can be treated in a prison setting;
(8)That at a very early age the defendant exhibited signs of mental or emotional disturbance that went untreated;
(9) That the defendant was immature for his age and lacked the normal emotional development at the time of the commission of the offense; and
(10) Any other mitigating factor which is raised by the evidence produced by either the prosecution or defense at either the guilt or sentencing hearing. That is, you shall consider any aspect of the defendant's character or record or any aspect of the circumstances of the offense favorable to the defendant which is supported by the evidence.

alleged by the defendant, we affirm the judgment of the trial court and Court of Criminal Appeals.

## I.

## MOTION TO SUPPRESS

Prior to trial, defense counsel moved to suppress a series of statements given by Bush to police officers on September 25, 1988, alleging that the statements were obtained in violation of the defendant's rights under the Fifth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution. First, Bush alleged that he was not given warnings in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before he gave the first tape-recorded statement even though he was subjected to custodial interrogation. As a result, Bush urged that the initial and all subsequent statements were tainted. Alternatively, Bush asserted that the waiver of his rights given prior to the second interview was not valid because he was mentally ill and not competent to knowingly and intelligently waive his Miranda rights. Finally, Bush contended that the officers continued to question him after he invoked his Fifth Amendment right to counsel.

An evidentiary hearing was held on the motion to suppress. Sheriff Abston testified that on Sunday, September 25, 1988, he was contacted by his office that Larry Bush wanted to bring his son to the jail to discuss the Jodie Lefever homicide. Defendant, along with his father, met Sheriff Abston at the county jail around 1:30 p.m. Larry Bush told Sheriff Abston that the defendant wanted to make a statement that he was with the people who murdered Lefever. Because

-13-

the jail was crowded with visitors on Sundays, and because Bush indicated that he also had information about an unrelated homicide that had occurred in the city of Cookeville, Sheriff Abston asked the defendant and his father if they would be willing to go with him to the Cookeville police station to discuss the case. They agreed. Larry Bush rode in the front passenger seat of a deputy sheriff's patrol car and the defendant rode, unrestrained, in the back seat of the same car.

At approximately 2:47 p.m., officer Bob Terry, Sheriff Abston, and the defendant entered an investigator's office, where the defendant gave a tape-recorded statement, admitting his presence during the murder of Lefever, but denying his involvement in the crime. Essentially, Bush told law enforcement officials that he had received a phone call, in which the unknown caller threatened to harm his family if he did not follow the caller's instructions. Bush believed the caller, and as instructed, went to Lefever's home where he was met by four unknown hooded men who forced him to knock on the door so they could gain entry to Lefever's home. Bush recounted how the hooded intruders beat and eventually murdered Lefever.

When this interview ended, Sheriff Abston and Officer Terry left the room, and were approached in the hallway by Deputy Doug Burgess and T.B.I. agent Larry O'Rear who told them that Shelia Bush, the defendant's wife, had given a statement at the Putnam County sheriff's office in which she had implicated Michael Bush and said that he had admitted to her that he had killed Lefever. Upon receiving this information, Sheriff Abston testified that he then considered the defendant to be a suspect in the homicide. Bush was given his Miranda

-14-

warnings for the first time at approximately 4:17 p.m. He signed a waiver of those rights, and a second tape-recorded interview was conducted during which Bush basically repeated the information given in his first statement. In addition, Bush described the position in which Lefever was lying when he left her home, and he told officers that, at the direction of the hooded men, he had disposed of the pieces of the stick used to beat Lefever and a knife near a boat ramp on Center Hill Dam. This second interview ended when Bush and Officer Terry became involved in a heated discussion about the defendant's involvement in the murder.

A third interview began at approximately 6:04 in which Bush gave a statement about the unrelated Cookeville homicide. However, Bush requested an attorney during this session and the police officers testified that all questioning then ceased.

David Brady, the attorney appointed to represent Bush after he requested counsel testified that the trial judge contacted him around 10:00 p.m. and he saw Bush at approximately 11:00 p.m. According to Brady, Bush was strangely calm and detached and his answers to questions were vague and non-specific. Brady considered Bush's behavior unusual and requested a psychiatric evaluation.

Dr. Blair, the clinical psychologist who had examined Bush in early 1989 when he was first referred to M.T.M.H.I. for a competency evaluation also testified at the suppression hearing. Dr. Blair opined, based upon her examinations of the defendant and review of the taped statements, that the defendant was suffering from paranoid schizophrenia when he executed the waiver of his rights prior to the

second tape-recorded interview and that the waiver was not "a product of rational reasoning."

Law enforcement officials who conducted the interviews with Bush all testified that he was coherent and responsive to questioning and appeared normal. Bush did not, according to the officers, discuss demons, vampires, or other delusions. In addition, Sheriff Abston testified that neither the defendant nor Larry Bush indicated that there was any problem with the defendant's mental condition at the time he came in to give the statement.

Upon considering the proof, the trial judge denied the motion to suppress finding that (1) Bush was not entitled to Miranda warnings prior to the initial interview because he was not subjected to custodial interrogation; (2) Bush was not a suspect in the mind of Sheriff Abston until after the conclusion of the initial interview; (3) Bush was advised of his Miranda rights before the second interview; and knowingly and intelligently waived those rights; and (4) Bush was not questioned further after he invoked his Fifth Amendment right to counsel. The trial court's denial of the motion was affirmed by the Court of Criminal Appeals.

## A. Custodial Interrogation

Defendant first urges, in this Court, that the statements should have been suppressed because he was not advised of his Miranda warnings even though he was in custody when he gave the first tape-recorded statement. In reviewing this issue, we are mindful that an appellate court must uphold a trial court's findings of fact in a suppression hearing unless the evidence in the record preponderates

against those findings.  State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996).

      We begin our analysis of this issue with the Miranda decision in which the United States Supreme Court held that a defendant's statements given during custodial police interrogation are inadmissible as evidence in the State's case-in-chief unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights.  Specifically, Miranda requires police to inform the person being questioned that (a) he has the right to remain silent; (b) any statement made may be used as evidence against him; (c) he has the right to the presence of an attorney; and (d) if he can not afford an attorney, one will be appointed for him prior to questioning, if he so desires.  Id., 384 U.S. at 444, 86 S.Ct. at 1612.

However, police officers are only obligated to administer Miranda warnings prior to "custodial interrogation" which has been defined as a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Stansbury v. California, 511 U.S. 318, 114 S.Ct. 1526, 1529, 128 L.Ed.2d 293 (1994).  The United States Supreme Court has held that it is appropriate to apply an objective test to determine whether a person is in custody and therefore entitled to receive Miranda warnings.  Courts must consider the totality of the circumstances of the interrogation and inquire "how a reasonable man in the suspect's position would have understood his situation."  Berkemer v. McCarty, 468 U.S. 420, 422, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984); see also Stansbury, 511 U.S. at ___, 114 S.Ct. at 1529.  The United States Supreme Court has emphasized, however, that "any inquiry into whether the interrogating

officers have focused their suspicions upon the individual being questioned (assuming those suspicions remain undisclosed) is not relevant for purposes of *Miranda*." Stansbury, 511 U.S. at ___, 114 S.Ct. at 1530.

Recently, this Court, in State v. Anderson, __ S.W.2d ___ (Tenn. 1996), expressly adopted the objective analysis employed by the United States Supreme Court and rejected as irrelevant to the determination of custody any inquiry into the subjective beliefs of law enforcement officials about the culpability or guilt of the person being questioned. We adopted several nonexclusive factors to aid in the objective assessment of whether a reasonable person would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. Relevant factors include (1) the time and location of the interrogation; (2) the duration and character of the questioning; (3) the officer's tone of voice and general demeanor; (4) the method of transportation to the place of questioning; (5) the number of police officers present; (6) limitations on movement or other forms of restraint imposed during the interrogation; (7) interactions between the officer and the person being questioned, including the words spoken by the officer and the verbal or nonverbal responses of the person being questioned; (8) the extent to which the person being questioned is confronted with the officer's suspicions of guilt or evidence of guilt; and finally (9) the extent to which the person being questioned is aware that he or she is free to refrain from answering questions or to end the interview at will. Anderson, ___ S.W.2d at ___.

Considering the totality of the circumstances, including the factors delineated in Anderson, the evidence in this record does not preponderate against

the lower courts' finding that Bush was not in custody when he was initially interviewed by law enforcement officials. Bush initiated the contact with Sheriff Abston. He asked his father to go with him to the Putnam County Sheriff's office. Indeed, Sheriff Abston was called from the golf course on a Sunday by his office to meet Bush. He voluntarily sought to give information about the murder of Jodie Lefever. Bush and his father agreed to accompany Sheriff Abston to the Cookeville police department to further discuss the case. Although Bush was transported to the Cookeville police department in a patrol car, he was not restrained, and his father rode along in the front seat of the same car. Bush was not restrained upon arrival at the police station nor during the interview. Only two officers were present during the initial interview, and they did not accuse Bush of the crime or question the truth of his story. Indeed, Bush did most of the talking and seemed eager to give the statement, with the officers asking very few questions. While Bush was not told that he was free to leave, he was also never told that he could not leave, and he did not at any point attempt to leave. Finally, even assuming, as the defense argues, that law enforcement officials were aware of Shelia Bush's statement and considered the defendant a suspect from the moment he arrived at the sheriff's office, that has no bearing on the determination of whether Michael Bush was in custody. The undisclosed knowledge or suspicions of law enforcement officials are irrelevant to the question of whether a reasonable person in the position of Michael Bush would have considered himself deprived of freedom of movement to a degree associated with a formal arrest. The evidence in the record does not preponderate against the trial court and Court of Criminal Appeals' determination that Bush was not in custody during the initial interview. Therefore, this issue is without merit.

## B. Waiver of Rights

Bush next contends that the statements resulting from the second, and any subsequent interviews, should have been suppressed because he presented expert testimony at the suppression hearing that he was not competent to make a knowing and intelligent waiver of his Miranda rights. Essentially Bush argues that because the State did not offer expert proof on his mental condition, the validity of the waiver was not established. As support for his argument, the defendant relies upon State v. Hammock, 867 S.W.2d 8 (Tenn. Crim. App. 1993). In that case, defendant presented unequivocal expert testimony to establish that he was legally insane at the time he committed the murders. Rather than presenting expert proof to contradict the defendant's claim, the State relied upon lay witnesses who testified to the defendant's appearance and actions. Under those circumstances, the Court of Criminal Appeals reversed the defendant's convictions finding that the State had failed to prove sanity beyond a reasonable doubt. In Hammock, therefore, the Court of Criminal Appeals was concerned with the sufficiency of the evidence to establish the offense. No waiver issues were involved.

Contrary to the defendant's assertion, Hammock should not be read as establishing the broad proposition that the State must introduce expert proof that a waiver was knowingly and intelligently executed whenever a defendant introduces expert testimony to the contrary. Unlike the element of sanity in Hammock which required proof beyond a reasonable doubt, the State need only prove waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 173, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986). In determining whether the State has satisfied that burden of proof, courts must look to the totality of the circumstances.

State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). Applying those principles, the trial court in this case concluded that the waiver was valid. The evidence does not preponderate against that finding.

Even assuming, as Dr. Blair testified, that Bush executed the waiver because he was suffering from paranoid schizophrenia, that fact does not render the waiver invalid. The United States Supreme Court in Connelly, supra, refused to adopt a "free will" rule that would require a court to find a waiver invalid whenever a defendant feels compelled by a mental illness to waive his rights. In so holding, the Court stated

> *Miranda* protects defendants against government coercion leading
> them to surrender rights protected by the Fifth Amendment; it goes
> no further . Respondent's perception of coercion flowing from the
> "voice of God," however important or significant such a perception
> may be in other disciplines, is a matter to which the United States
> Constitution does not speak.

Connelly, 479 U.S. at 174, 107 S.Ct. at 524. Here, as in Connelly, there is no proof of police overreaching. Law enforcement officials testified that Bush appeared normal, was coherent and responsive to questioning, and did not discuss demons, vampires, or other delusions. Therefore, in the absence of police overreaching, the trial court and Court of Criminal Appeals did not err in upholding the validity of the waiver, even assuming that the defendant's decision to execute the waiver could have been influenced by mental illness.

### C. Right to Counsel

In his final argument for suppression of his statements defendant contends

-21-

that the Court of Criminal Appeals mistakenly characterized his right to counsel claim as an alleged violation of the Sixth rather than the Fifth Amendment. We disagree. The Court of Criminal Appeals simply noted that the Sixth Amendment right to counsel does not attach until after formal proceedings have begun. The intermediate court then recognized the applicability of the Fifth Amendment right to counsel. The Court of Criminal Appeals concluded that when the defendant invoked his Fifth Amendment right to counsel, questioning ceased and an attorney was appointed. The Court of Criminal Appeals therefore affirmed the trial court's finding that no violation of the defendant's Fifth Amendment right to counsel occurred. The evidence in the record does not preponderate against that finding. This issue is without merit.

## II.

## SUFFICIENCY OF THE EVIDENCE

Relying upon State v. Brown, 836 S.W.2d 530 (Tenn. 1992), defendant next contends that the trial court and Court of Criminal Appeals erred in finding the evidence sufficient to establish premeditation and deliberation. In considering this claim, we apply the familiar rule that where the sufficiency of the convicting evidence is challenged, the relevant question for an appellate court is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cazes, 875 S.W.2d 253 (Tenn. 1994).

At the time the offense was committed, premeditated first degree murder was defined as the "willful, deliberate, malicious and premeditated killing of another." Tenn. Code Ann. § 39-2-202(a)(1) (Supp. 1988).[6] In Brown, supra, we stated that premeditation and deliberation are not synonymous terms. While the existence of both elements may be established by circumstantial evidence alone, premeditation requires proof of a previous intent to kill, while deliberation requires proof of a "cool purpose" that includes some period of reflection during which the mind is free from passion and excitement. Id. at 539.

With respect to deliberation, the proof shows that the defendant announced to his wife that he knew "a woman he could knock in the head and get some money." Since Bush was acquainted with Lefever, he necessarily knew she was a frail, elderly lady. Despite that knowledge he took a board with him to her house to accomplish his stated intention. Evidence of procurement of a weapon is probative to prove premeditation. Brown, 836 S.W.2d at 541. After Bush broke the board by striking the victim with it, he did not end the assault but procured a second weapon, the butcher knife, from the kitchen and proceeded to stab Lefever forty-three times down the side of her head and on her back.

With respect to deliberation, the evidence shows that before opening the drawer to obtain the butcher knife, Bush removed his shirt and wrapped his hand in what reasonably can be inferred to be an attempt to avoid leaving fingerprints. After stabbing Lefever forty-three times, Bush maintained the presence of mind

---

[6]That statute has now been replaced by Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 1996).

and took the time to collect the broken board. He walked back to the designated place and met his wife, and from there he immediately directed his wife to drive him to Center Hill Lake where he disposed of the evidence. These facts are sufficient to establish that the killing was committed with deliberation and in the absence of passion. State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

Considering the proof in this record in the light most favorable to the State, as we are required to do, we agree with the Court of Criminal Appeals that the evidence is sufficient to establish premeditation and deliberation.

## III.

### REBUTTAL PSYCHIATRIC EVIDENCE

Defendant next contends that the testimony of Dr. Athar, a psychiatrist who had treated defendant in 1991 while he was a patient at M.T.M.H.I, and Endean Gerdes, the treatment coordinator at M.T.M.H.I., introduced at the sentencing hearing by the State to rebut the mitigating evidence that the defendant was mentally ill, was obtained in violation of his Sixth Amendment right to counsel and his Fifth Amendment right to remain silent.

In Estelle v. Smith, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the United States Supreme Court held that the Fifth Amendment right against compelled self-incrimination precludes the State from subjecting a capital defendant to a psychiatric examination concerning future dangerousness without first informing the defendant that he has a right to remain silent and that anything

he says can be used against him at the sentencing proceeding. Id., 451 U.S. at 471, 101 S.Ct. at 1872-76. Once a capital defendant is formally charged, the Sixth Amendment right to counsel precludes such an examination unless defense counsel is first notified that the psychiatric examination will encompass the issue of the defendant's future dangerousness. Id., 451 U.S. at 471, 101 S.Ct. 1877; see also Powell v. Texas, 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989). When a capital defendant asserts a mental status defense, however, he waives the right to raise a Fifth Amendment challenge to the prosecution's use of evidence obtained through the psychiatric examination to rebut the defense. Buchanan v. Kentucky, 483 U.S. 4022, 422-23, 107 S.Ct. 2906, 2917, 2918 (1987). Likewise, the United States Supreme Court has stated that there is no Sixth Amendment violation where defense counsel requests the psychiatric evaluation and is on notice that if a mental status defense is presented, psychological evidence will be used by the State in rebuttal. Id.

Applying those principles to the facts in this case, we agree with the Court of Criminal Appeals' conclusion that the State's rebuttal testimony was appropriately introduced. Defense counsel requested the first mental evaluation in this case and was notified of each subsequent psychiatric evaluation which was court ordered at the request of either the defendant or the State. Bush relied upon his mental status at the time of the offense as a mitigating circumstance in the penalty phase of the trial. Accordingly, introduction of the rebuttal testimony did not violate the defendant's Fifth or Sixth Amendment rights.

**IV.**

-25-

## LIFE IMPRISONMENT AND PAROLE ELIGIBILITY

Approximately fifteen minutes after deliberations began in the sentencing phase of this case, the jury sent a note to the trial court asking, "How many years does the [defendant] serve if he gets life imprisonment and how long before parole?" Counsel for Bush requested that the jury be instructed that under present law the defendant would have to serve a minimum of thirty calendar years before becoming eligible for parole. In addition, counsel requested that the jury be instructed that a life sentence is literally a life sentence since Bush has no absolute legal right to parole even though he might at some point become parole eligible. The trial judge denied defense counsel's request, and instead, instructed the jury that "parole eligibility is not an issue in a capital case. . . ." The Court of Criminal Appeals affirmed the trial court's action.

Relying upon a recent United States Supreme Court decision, Simmons v. South Carolina, ___ U.S. ____, 114 S.Ct. 1392, 129 L.Ed.2d 133 (1994), the defendant contends in this Court that the trial court's response to the jury question violated his right to Due Process. We disagree.

In Simmons, the prosecution was allowed to argue future dangerousness to the jury as a basis supporting imposition of the death penalty. Simmons sought to rebut the prosecution's generalized argument in two ways. First, he attempted to introduce proof that due to his unique psychological problems, his future dangerousness was limited to elderly women and would not be a threat in a prison setting where he would have no contact with such individuals. Secondly, Simmons sought to introduce proof that under South Carolina law, he would not

be eligible for parole if sentenced to life imprisonment and therefore would never pose a future danger to elderly women. The trial judge refused to allow Simmons to offer any rebuttal proof of his parole ineligibility and also refused Simmons requested jury instruction defining a life sentence as "imprisonment in the state penitentiary for the balance of his natural life."

After deliberating ninety minutes on the appropriate sentence, the jury sent a note to the judge asking, "Does the imposition of a life sentence carry with it the possibility of parole?" Over Simmons' objection, the trial judge instructed the jury "not to consider parole or parole eligibility in reaching your verdict. That is not a proper issue for your consideration. The terms life imprisonment and death sentence are to be understood in their plan [sic] and ordinary meaning." Twenty-five minutes later the jury returned to the courtroom with a sentence of death.

On appeal to the United States Supreme Court, Simmons claimed that the trial court's refusal to allow proof or instruction about his parole ineligibility violated his rights under the Due Process Clause. A majority of the Court in Simmons agreed and held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, ___ U.S. at ___, 114 S.Ct. at 2190. If parole is an option for a defendant sentenced to life imprisonment, however, the Simmons Court emphasized that it will not second-guess the refusal of a State to allow proof, instruction, or argument to the jury on the availability of parole. Simmons, ___ U.S. at ___, 114 S.Ct. at 2196; see also Simmons, ___ U.S. at ___, 114 S.Ct. at

-27-

2200 (O'Connor, J., concurring) ("In a state in which parole is available, the Constitution does not require (or preclude) jury consideration of that fact.")

Since Tennessee is a state in which defendants sentenced to life imprisonment are eligible for parole, Simmons does not require that the jury be given information about parole availability.[7]  Indeed, the trial court's refusal to give defendant's requested response to the jury question was entirely consistent with prior decisions of this Court holding that the after-effect of a jury's verdict, such as parole availability, is not a proper instruction or consideration for the jury during deliberations.  State v. Caughron, 855 S.W.2d 526, 543 (Tenn. 1993); State v. Payne, 791 S.W.2d 10, 21 (Tenn. 1990).[8]  Accordingly, we conclude that the trial court did not err by refusing to respond to the jury's question as the defendant requested.

# V.

## MURDER TO PREVENT ARREST - AGGRAVATING CIRCUMSTANCE (I)(6)

---

[7]We also note that unlike Simmons, the trial judge in this case appropriately did not allow the State to argue future dangerousness to the jury as a basis for imposition of the death penalty. At one point during the closing argument prosecution counsel commented, "It's not going to protect the other Jodie Lefevers of the world." Defense counsel immediately objected and the trial judge sustained the objection.

[8]Effective July 1, 1993, the available punishments for first degree murder are now (1) death; (2) imprisonment for life without possibility of parole; or (3) imprisonment for life.  Tenn. Code Ann. § 39-13-202 (b) (1996 Supp.).  Prior to that enactment, the only available punishment options for first degree murder were death and life with the possibility of parole.  Another part of the recent legislative enactment requires that jurors now be instructed "that a defendant who receives a sentence of imprisonment for life shall not be eligible for parole consideration until the defendant has served at least twenty-five (25) full calendar years of such sentence."  In addition, jurors must be informed that "a defendant who receives a sentence of imprisonment for life without possibility of parole shall never be eligible for release on parole."  Tenn. Code Ann. § 39-13-204(e)(2) (1996 Supp.).

-28-

With respect to this issue, defendant first argues that, if interpreted to apply under the facts of this case, the aggravating circumstance, "the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another" violates the narrowing principles adopted by a majority of this Court in State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992). The only basis for finding the aggravating circumstance in this case, according to the defendant, is the theory that he killed the victim to prevent his arrest for killing her, a theory and circumstance arguably present in every first degree murder in which the victim knows the murderer. Defendant urges this Court to adopt a narrowing construction of the aggravating circumstance and find the evidence in this case insufficient to support its application.

This Court has previously held that to establish the applicability of this aggravating circumstance, the State must prove that avoidance of prosecution or arrest was one of the purposes motivating the killing. State v. Smith, 868 S.W.2d 561, 581 (Tenn. 1993). We have refused to narrow the application of the circumstance to only those killings which are solely or predominantly motivated by a desire to avoid arrest or prosecution. State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986) (avoidance of arrest need not be sole motive for murder). While we agree with the defendant that the aggravating circumstance logically can not and does not apply when the only theory advanced by the State is that the victim was killed to prevent the defendant from being arrested or prosecuted for the killing, we do not agree that was the only theory advanced by the State and supported by the proof, in this record.

-29-

Indeed, as the Court of Criminal Appeals observed, the evidence supports the conclusion that the victim was killed to prevent the defendant's apprehension and prosecution for the separate offense of burglary of which the defendant was convicted. The proof shows that the defendant intended to "get" money from a victim with whom he was well-acquainted. By refusing to reveal the residence or identity of the intended victim to his wife, the defendant was obviously attempting to avoid having anyone witness the crime. By his own statement, the defendant admitted that the victim recognized him. The proof therefore supports the jury's finding that one purpose of the murder was to avoid prosecution or arrest. See also State v. Smith, 857 S.W.2d 1, 14 (Tenn. 1993); State v. Evans, 838 S.W.2d 185 (Tenn. 1992); State v. Thompson, 768 S.W.2d 239 (Tenn. 1989); State v. Irick, 762 S.W.2d 121 (Tenn. 1988); State v. Coe, 655 S.W.2d 903 (Tenn. 1983).

The facts of this case are distinguishable from State v. Branam, 855 S.W.2d 563 (Tenn. 1993), on which the defendant relies. In Branam, the proof showed that the killer was a person whom the victim did not know, and the defendant, whom the victim knew, remained out of the victim's sight. Therefore, there was no proof that the victim could have identified the triggerman or the defendant, and therefore, no proof that one purpose motivating the killing was avoidance of prosecution or arrest.

Application of the aggravating circumstance also does not violate the narrowing principles of Middlebrooks. In Middlebrooks, a majority of this Court held that when a defendant is convicted of the statutory offense of felony murder, the felony murder aggravating circumstance, which duplicates the elements of the

-30-

underlying offense, does not sufficiently narrow the class of persons eligible for the death penalty and can not be relied upon as a basis for imposition of the death penalty.

In this case, the defendant was convicted of premeditated first degree murder which required the State prove, beyond a reasonable doubt, the willful, deliberate, malicious and premeditated killing of another. The State was not statutorily required to prove, as part of the offense, that one purpose motivating the killing was the avoidance of arrest or prosecution. Therefore, the aggravating circumstance does not duplicate the elements of the underlying offense and sufficiently narrows the class of persons eligible for the death penalty. Cf. State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994) (murder for renumeration). Consequently, we decline the defendant's invitation to further limit application of the aggravating circumstance.

## VI.

### JURY INSTRUCTION - AGGRAVATING CIRCUMSTANCE (i)(5)

In his final issue, the defendant contends that the jury was not properly instructed with respect to the remaining aggravating circumstances. Jodie Lefever was murdered in 1988. At the time of the killing, one of the aggravating circumstances upon which the State relied was defined by statute as "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." See Tenn. Code Ann. § 39-2-203(I)(5)(1982). In 1989, the statute was amended and the aggravating circumstance redefined as "[t]he murder was

-31-

especially heinous, atrocious, or cruel in that it involved torture or <u>serious physical abuse beyond that necessary to produce death</u>." Tenn. Code Ann. § 39-13-204(I)(5)(1991)(emphasis added).

The trial of this defendant was held in February of 1993. The trial court, without objection from the defense or the State, instructed the jury in the language of the 1989 statute, rather than in accordance with the law as it existed when the offense was committed in 1988. Under decisions of this Court rendered <u>after</u> the trial of this case,[9] it is clear that the sentencing hearing should have been conducted in accordance with the 1988 law, the law in effect at the time of the commission of the offense. <u>State v. Brimmer</u>, 876 S.W.2d 75, 82 (Tenn. 1994).

Therefore, instructing the jury in the terms of the amended statute was erroneous. The defendant argues that he is entitled to a new sentencing hearing which must be conducted in accordance with the law in effect at the time the offense was committed. The State argues that the error was harmless and relies upon the decision of the Court of Criminal Appeals which held that the error was harmless beyond a reasonable doubt because the amended definition of the aggravating circumstance "required a higher burden on the State to prove that the act involved torture or serious physical abuse." While we do not agree with the intermediate court that the amended definition imposed a higher burden upon the State, we have determined, for the reasons explained below, that the erroneous jury instruction is harmless beyond a reasonable doubt and does not "affirmatively

_____

[9]We emphasize that the record in this case reflects that the trial court conscientiously applied current and available law to ensure that this defendant received a fair trial.

-32-

appear to have affected the result of the trial on the merits." Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

The 1989 version of the aggravating circumstance is different from the 1988 version in that it substitutes the phrase "serious physical abuse beyond that necessary to produce death" for the phrase "depravity of mind." The aggravating circumstance is redefined. Unlike the Court of Criminal Appeals, we consider the amendment a substantive change which imposes not a different level of proof upon the State, but different factors of proof. Therefore, it is not accurate to broadly characterize an instructional error such as that complained of on appeal in this case as beneficial to the defendant.[10] Depending upon the facts of the case, such an error could conceivably be beneficial to the State. We do not agree, however, with the defendant's argument that such an error always requires reversal and may never be harmless. The defendant's reliance upon State v. Stephenson, 875 S.W.2d 530 (Tenn. 1994) is misplaced. The circumstances in Stephenson were unique and are not present in this case. The jury was instructed and returned a verdict in accordance with 1988 law, though the offense was committed after the statute was amended in 1989. The defendant was therefore

_____

[10]The entire sentencing hearing in this case was conducted in accordance with the 1989 law. Clearly, portions of that statute are beneficial to the defendant in all cases and impose a higher burden upon the State. For example, the 1989 statute explicitly requires the State to prove the existence of aggravating circumstances beyond a reasonable doubt and must establish that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-204(f) & (g) (1991 Repl). In contrast, the 1982 statute required only a showing that there were no mitigating circumstances sufficiently substantial to outweigh the aggravating circumstances. Tenn. Code Ann. § 39-2-203(g)(2)(1982 Repl.). In addition, unlike the 1982 statute, the 1989 statute entitles a defendant to instructions on non-statutory mitigating circumstances. Tenn. Code Ann. § 39-13-204(e) (1991 Repl) & Odom, supra. Given the overall benefits, it is certainly conceivable that a defendant would prefer instructions in accordance with the 1989 statute. We again emphasize that the instruction now complained of as error was not challenged in the trial court.

deprived of the previously noted benefits of the 1989 law. When the error was called to the trial court's attention, the jurors were recalled, some two weeks after the trial, and questioned by the trial court to establish that the erroneous jury instructions had no impact on the verdict rendered, a procedure that was clearly inappropriate. Under such circumstances, this Court found that error required reversal. Unlike Stephenson, the instructional error in this case is harmless for two reasons.

First, this aggravating circumstance was sufficiently proven by evidence of torture, independent of the depravity or serious physical abuse prong of the aggravating circumstance. State v. Hines, 919 S.W.2d 573, 587 (Tenn. 1995). The trial court correctly instructed the jury as to the definitions of the terms "heinous," "atrocious," and "cruel" in accordance with this Court's decision in State v. Williams, 690 S.W.2d 517, 529 (Tenn. 1985). Also in accordance with Williams, the trial court instructed the jury that "torture" means "the infliction of severe physical or mental pain upon the victim while he or she remains alive or conscious." Id. The proof introduced by the State during the trial clearly established torture. The victim was initially assaulted and knocked to the floor by the defendant. While she was lying helpless on the floor, the defendant retrieved a butcher knife, returned to the den, and began stabbing her. Dr. Harlan testified that the victim would have been alive and conscious for at least three to five minutes during the assault, and possibly as long as thirty minutes. The pain of the stabbing during that period of consciousness would have been comparable, according to Dr. Harlan, to undergoing surgery without an anesthetic. Therefore, based upon the proof in this record, we are convinced beyond a reasonable doubt

that had the sentencing jury given no weight to the invalid aggravating criteria [serious physical abuse], the defendant's sentence would have been the same. State v. Howell, 868 S.W.2d 238, 260-61 (Tenn. 1993). Therefore the error does not affirmatively appear to have affected the result of the sentencing hearing.

Alternatively, we are convinced beyond a reasonable doubt that had the jury been properly instructed, it would have found the evidence sufficient to establish depravity of mind beyond a reasonable doubt. In Williams, this Court stated that depravity is inherent in the state of mind of a murderer who willfully inflicts severe physical or mental pain on a victim prior to death or at a time very close to the victim's death. Id., 690 S.W.2d at 529. In this case the defendant beat and stabbed the victim, a person whom he knew, and later boasted about how he had practiced karate on Lefever. Such evidence clearly establishes that the defendant willfully inflicted severe physical pain upon the victim. Accordingly, we conclude that had the jury been properly instructed it would have found depravity of mind. Therefore, the instructional error in this case does not affirmatively appear to have affected the verdict and is harmless beyond a reasonable doubt.

## VII.

### PROPORTIONALITY REVIEW

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1)(1991 Repl.), we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion; that the

-35-

evidence supports, as previously discussed, the jury's findings of the statutory aggravating circumstances; and the jury's finding that the aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt. Tenn. Code Ann. § 39-13-206(c)(1)(A)-(C)(1991 Repl.). Finally, comparative proportionality review convinces us that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases considering the nature of the crime and the defendant. Tenn. Code Ann. § 39-13-206(c)(1)(D) (1991 Repl.).

Our 1977 statute created a comparative proportionality review to serve as an additional safeguard against arbitrary or capricious sentencing. Such review of death cases insures rationality and consistency in the imposition of the death penalty. We have studied, compared, and analyzed cases and conducted a meaningful proportionality review as outlined in State v. Barber, 753 S.W.2d 659, 663-68 (Tenn. 1988). We have reviewed Rule 12 reports from trial judges submitted over the past eighteen years in all criminal trials for first degree murder in which life imprisonment or a sentence of death has been imposed. We have made an independent, conscientious and thorough review of this case, as we have in every other capital case that has come before this Court. As a result of that review, we are of the opinion that the senseless, gruesome, premeditated killing of this innocent, helpless, elderly woman clearly warrants the imposition of the death penalty. Defendant's deliberate acts showed a total disregard for human life. The victim, a seventy-nine year old widow, was the best friend of the defendant's grandmother. The defendant used this relationship to gain access to her home. The defendant savagely beat the victim with a stick and then stabbed

her forty-three times. This brutal murder places the defendant Bush into the class of defendants deserving capital punishment and is not disproportionate to the sentences imposed in similar cases. See State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993); State v. McNish, 722 S.W.2d 490 (Tenn. 1987); State v. Harbison, 704 S.W.2d 314 (Tenn. 1986); State v. Barnes, 703 S.W.2d 611 (Tenn. 1985); State v. Cone, 665 S.W.2d 87 (Tenn. 1984); State v. Campbell, 664 S.W.2d 281 (Tenn. 1984); State v. Melson, 638 S.W.2d 342 (Tenn. 1982).

## CONCLUSION

We have considered the defendant's assignments of error and determined that none affirmatively appear to have affected the verdict of the trial or the sentencing proceeding. With respect to issues not specifically addressed herein, we affirm the well-reasoned decision of the Court of Criminal Appeals, authored by Judge David Hayes and joined in by Judge Paul G. Summers and Judge William M. Barker. Relevant portions of that opinion are published hereafter as an appendix. The defendant's conviction for first degree murder and sentence of death by electrocution are affirmed. The sentence of death will be carried out as provided by law on the 7th day of July 1997 unless otherwise ordered by this Court, or other proper authorities. Costs of this appeal are adjudged against the defendant.

_____
Frank F. Drowota, III
Justice

-37-

**Concur:**

Anderson, Holder, JJ.

Reid, J., Concurring by Separate Opinion

Birch, C.J., Dissenting by Separate Opinion

# Appendix

**(Excerpts from the Court of Criminal Appeals' Decision)**

**3. THE MARITAL PRIVILEGE**

**A.      WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS THE TESTIMONY OF SHEILA BUSH HAMMOCK**

The appellant contends that the marital privilege should have barred, at trial, the testimony of Sheila Bush Hammock concerning statements made by the appellant to Ms. Hammock during their marriage. Specifically, the appellant argues that, because the trial court restricted examination of Ms. Hammock at the suppression hearing to "the circumstances under which any statements were made that might be attributable or not attributable to some marital privilege," the court was unable to properly determine whether the appellant could invoke the privilege. In other words, according to the appellant, testimony concerning "the details and contents of the statements" was essential to the resolution of the appellant's motion.

The suppression hearing was held on June 9, 1992. At the hearing, Ms. Hammock testified that she had married the appellant on August 13, 1988, three days prior to the murder of Jodie Lefever. She further testified that she and the appellant had been dating "off and on two years" before their marriage. Both before and after their marriage, the appellant "threatened" and "beat" Ms. Hammock. Ms. Hammock also stated, "He would always call me names and make fun of me. I couldn't say anything right." Moreover, following their marriage, while the appellant and Ms. Hammock were living with her mother, the

appellant would not allow Ms. Hammock to visit friends.  After they moved to his

parents' house, the appellant would not allow her to visit her mother.

Ms. Hammock concluded that she "was just scared of Michael," and that

her relationship with the appellant was a relationship built upon fear and threats.

For example, after the appellant admitted to her that he had killed Ms. Lefever, he

told Ms. Hammock that the Mafia was watching her, and that, if she ever told

anyone what he had done, she would be killed.  On the day that Ms. Hammock

decided to leave the appellant, he again physically abused her.  The State

introduced into evidence a picture of bruises that Ms. Hammock suffered as a

result of the appellant's abuse.  At the time of the suppression hearing, Ms.

Hammock and the appellant had been divorced for approximately two years.

The rule of marital privilege applicable in the appellant's case was

announced by our supreme court in McCormick v. State, 186 S.W. 95 (Tenn.

1916).[11]  In McCormick, 186 S.W. at 97, the supreme court held that "[s]ound

---

[11] The appellant in his brief suggests that the trial court's decision to deny the appellant the marital privilege implicates the *ex post facto* provisions of the United States and Tennessee Constitutions.  We disagree.  Between the time of the offense and the time of trial, there were no significant changes in the law of marital privilege in criminal cases.  Although the Tennessee Rules of Evidence were adopted in 1990, Tenn. R. Evid. 501 simply states,

> Except as otherwise provided by constitution, statute, common law, or by
> these or other rules promulgated by the Tennessee Supreme Court, no
> person has a privilege to:
> (1)  Refuse to be a witness;
> (2)  Refuse to disclose any matter;
> (3)  Refuse to produce any object or writing; or
> (4)  Prevent another from being a witness or disclosing any
>      matter or producing any object or writing.

The Advisory Commission Comments to Rule 501 refer one to McCormick for the rule governing spousal communications in criminal cases.  Clearly, Rule 501 also encompasses the exceptions to the marital privilege implicit in this court's opinion in Adams v. State, 563 S.W.2d 804 (Tenn. Crim. App. 1978).

In State v. Hurley, 876 S.W.2d 57, 64 (Tenn. 1993), cert. denied, __ U.S. __, 115 S.Ct. 328 (1994), our supreme court modified the marital privilege in criminal cases so that the testifying spouse alone had the right to invoke the privilege.  However, the opinion was filed on April 5, 1993,

public policy requires that neither the husband nor the wife shall be permitted to testify, in criminal cases, as to any matter coming to his or her knowledge by reason of the marital relation." See also Burton v. State, 501 S.W.2d 814, 817-819 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1973); Bragan, No. 03C01-9403-CR-00121. Under this rule, either the testifying or non-testifying spouse can invoke the privilege. Bragan, No. 03C01-9403-CR-00121. However, the privilege is not absolute. In Adams, 563 S.W.2d at 808, this court observed that the following conditions must exist before a communication between husband and wife can be considered privileged:

> (1) The communications must originate in a confidence that they will not be disclosed.
>
> (2) This element of confidentiality must be essential to the full and satisfactory maintenance of the relation between the parties.
>
> (3) The relation must be one which, in the opinion of the community, ought to be sedulously fostered.
>
> (4) The injury that would inure to the relation by the disclosure of the communications must be greater than the benefit thereby gained for the correct disposal of litigation.

The court in Adams noted that exceptions to the marital privilege generally arise

---

approximately two months after the appellant's trial. Thus, obviously, the trial court did not apply the Hurley rule in this case. In any event, even had the trial court applied the new rule, we have held that the Hurley rule is a procedural rule that does not affect any substantial rights of a defendant in a criminal case and, therefore, does not implicate *ex post facto* constitutional provisions. State v. Bragan, No. 03C01-9403-CR-00121 (Tenn. Crim. App. at Knoxville, July 5, 1995).

Finally, we note that the Hurley modification of the common law rule was superseded by statute when the legislature, in 1995, amended Tenn. Code Ann. § 24-1-201, which had previously only applied in civil cases. Section 24-1-201 now provides,

> (a) In either a civil or criminal proceeding, no married person has privilege to refuse to take the witness stand solely because that person's spouse is a party to the proceeding.
> (b) In either a civil or criminal proceeding, confidential communications between married persons are privileged and inadmissible if either spouse objects.

-43-

from the failure of the communication to meet these conditions.  Id.  "All four of these conditions must exist to protect the evidence by the marital privilege."  State v. Garland, 617 S.W.2d 176, 183 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1981).  Thus, testimony at the suppression hearing relevant to the first two conditions was unnecessary if sufficient evidence was presented to negate the last two conditions.

In Garland, 617 S.W.2d at 182-183, this court observed that the application of the marital privilege was inappropriate where the marriage between the parties was "extremely tumultuous."  Similarly, in this case, the trial court denied the appellant's motion to suppress on the basis of the following findings of fact:

> Sheila (Bush) Hammock and the defendant were married on August 13, 1988.  The Court further finds that the parties separated on or about September 25, 1988.  From the testimony, the Court further finds that a divorce was granted to the parties approximately two (2) years prior to the date of this hearing.  The Court further finds that the marriage was extremely turbulent and disturbing from its beginning.  The defendant regularly beat and physically abused the prospective witness.  He subjected her to various forms of mental and verbal abuse on a regular basis.  He threatened her with physical harm and death if she ever disclosed any of the crimes which he allegedly committed.  The threats were made before and after the threats [sic] were allegedly committed.

The findings of fact made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict;  this court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings.  State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994);  State v. Dick, 872 S.W.2d 938, 943 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993);  State

-44-

v. Killebrew, 760 S.W.2d 228, 233 (Tenn. Crim. App. 1988). We conclude that the record supports the trial court's findings. Thus, as in Garland, 617 S.W.2d at 183, "we do not believe that the conditions 3 and 4 enumerated in Adams are met." Therefore, contrary to the appellant's argument in his brief, further testimony regarding the contents of the appellant's statements to Ms. Hammock was unnecessary to the proper resolution of the appellant's motion.

**B.     WHETHER THE TRIAL COURT'S LIMITATION AT THE SUPPRESSION HEARING OF CROSS-EXAMINATION OF SHEILA BUSH HAMMOCK VIOLATED THE APPELLANT'S RIGHT TO CONFRONTATION UNDER THE SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE TENNESSEE CONSTITUTION.**

The appellant contends that, at the suppression hearing, he "was limited and restricted from confronting [his] accuser, Sheila Bush (Hammock), and thereby denied his rights under the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution." The right to confrontation set forth in the Sixth Amendment includes the right to conduct cross-examination.[12] However, we have previously observed, "[I]t is elementary that the exclusion of immaterial or irrelevant evidence does not abridge an accused's right to confrontation." State v. Marquadis, 649 S.W.2d 15, 17 (Tenn. Crim. App. 1982). See also Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435 (1986)("trial judges retain wide latitude insofar as the

---

[12] The Sixth Amendment to the United States Constitution is applicable to the states through the Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403, 85 S.Ct. 1065, 1068 (1965). Moreover, our supreme court has largely adopted the standards of the United States Supreme Court under the Sixth Amendment in determining whether there has been a violation of the Tennessee Constitution. State v. Middlebrooks, 840 S.W.2d 317, 332 (Tenn. 1992)(however, with respect to the right to physically confront one's accusers, our supreme court has observed that "[t]he 'face-to-face' language found in the Tennessee Constitution has been held to impose a higher right than that found in the federal constitution," State v. Deuter, 839 S.W.2d 391, 395 (Tenn. 1992)).

Confrontation Clause is concerned to impose reasonable limits on ... cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant"); Tenn. R. Evid. 611(a) ("[t]he court shall exercise appropriate control over the presentation of evidence and conduct of the trial when necessary to avoid abuse by counsel"). In other words, "the Confrontation Clause only guarantees 'an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense counsel might wish.'" Pennsylvania v. Ritchie, 480 U.S. 39, 53, 107 S.Ct. 989, 999 (1987)(citation omitted). We have already concluded that the testimony at the suppression hearing concerning the contents of the appellant's statements to Ms. Hammock would have been superfluous.

Moreover, this court has held that "the 'confrontation' guaranteed by the United States Constitution is confrontation at trial." Haggard v. State, 475 S.W.2d 186, 187 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1971). Similarly, in Ritchie, 480 U.S. at 52, 107 S.Ct. at 999, a plurality of the United States Supreme Court observed that "the right to confrontation is a trial right." See also United States v. Sasson, 62 F.3d 874, 881 n. 5 (7th Cir. 1995); United States v. De Los Santos, 819 F.2d 94, 97 (5th Cir. 1987); United States v. Boyce, 797 F.2d 691, 693 (8th Cir. 1986).[13] Defense counsel was able to fully and extensively cross-

[13] In Kentucky v. Stincer, 482 U.S. 730, 738, 107 S.Ct. 2658, 2663 n.9 (1987), Justice Blackmun stated that, in his opinion, denying a defendant access to information before trial may hinder that defendant's opportunity for effective cross-examination, thereby implicating the Confrontation Clause. However, our supreme court in Middlebrooks, 840 S.W.2d at 832, noted that "[t]he right to cross-examine witnesses ... does not include the power to require the pretrial disclosure of any and all information that might be useful in contradicting unfavorable testimony." In any event, the State in this case followed a policy of open file discovery and, prior to trial, informed the appellant's counsel of the statements made by the appellant to Sheila Bush Hammock.

examine Ms. Hammock at trial.  This claim is without merit.

4.      **WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S MOTION TO SUPPRESS THE TESTIMONY OF OTHER INMATES.**

The appellant contends that the trial court erred in allowing jailhouse informants to testify against the appellant concerning statements made by the appellant during his incarceration.  The appellant filed a motion on October 16, 1992, to exclude the testimony of William Moore, Jimmy Myers, Billy Goney, and other inmates, based on the allegation that law enforcement officers asked the inmates to elicit statements from the appellant in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199 (1964).  On November 13, 1992, an evidentiary hearing was held to resolve the appellant's motion.

Billy Goney and Jimmy Myers testified at the hearing.  Billy Goney stated that he was incarcerated with Michael Bush at the Putnam County Jail between September or October of 1988 and April of 1989.  He further alleged that, approximately one week after the appellant was placed in the jail, Bobby Lane and Doug Burgess, investigators with the Putnam County Sheriff's Department, asked Goney and fellow inmates, Guy Ramsey and Jimmy Myers, to tape conversations with Michael Bush.  The inmates were told that, if they cooperated with the police, the police "would help [them] out."  The inmates already had access to tape recorders and tapes, and the inmates used the equipment to tape conversations with the appellant.  However, Goney added,

> [W]hat we'd do was like Jimmy would ask Michael a
> question, say, did you kill that old woman, and we'd have the
> recorder playing and we'd ease up off the play button.  Then

> they would ask him another question like, do you like karate,
> and he would say, yeah, and we'd push yeah when he was
> saying yes.

Goney stated that he and his fellow informants made approximately three tapes,

and that Jimmy Myers, his half-brother, delivered the tapes to Deputy Lane.

Goney insisted that he never heard the appellant admit to killing Jodie Lefever.

Jimmy Myers also testified at the hearing.  He was also incarcerated at the

Putnam County Jail in September of 1988.  Indeed, he shared a cell with the

appellant.  However, Myers testified that neither Deputy Burgess nor Deputy Lane

asked the inmates to record conversations with Michael Bush.  Rather, Myers

asserted that Goney and Ramsey first suggested taping the appellant and first

contacted Deputies Lane and Burgess.  His testimony is somewhat unclear as to

whether the tapes were made before or after the inmates contacted the deputies.

Myers conceded that the officers may have been aware that the tapes were being

made.

In any event, before the tapes were made, Myers heard the appellant admit

to killing Ms. Lefever.

> Well, one time he was telling me and Billy and Ramsey all, I
> mean, he told us he tied Ms. Lefever up and stuff and
> stabbed her and waited on his wife.  His wife dropped him
> off and came back to pick him up, and he went down to the
> dam and washed blood off of him and stuff.  And, I mean,
> that's about all he said.  And then some other times he
> would tell a different story.

Again, Myers could not remember whether he and the other inmates spoke to the

deputies before or after they overheard this statement.  Finally, Myers conceded

on cross-examination that it was common knowledge at the jail that inmates could

get help from the police if they provided information. However, he testified that he was not promised any assistance in return for his testimony.

Deputy Burgess testified at the hearing that he never asked any of the inmates to tape conversations with Michael Bush, nor, to his knowledge, had any other deputy made such a request. Moreover, he never received any tapes, nor was he aware that tapes had been turned over to the Sheriff's Department until he found a tape in Bobby Lane's office the day before the hearing. He was not aware of any agreement between jailhouse informants and the police. He testified that Billy Goney and, possibly, Jimmy Myers had asked to speak with him several times. He spoke with Goney privately "maybe one or two" times. He told Goney "to keep his ears open and if he heard anything, let us know." Goney was unable to provide any useful information. At a subsequent hearing, on December 10, 1992, Burgess stated that he would not have turned to inmates to obtain incriminating statements from Michael Bush because "[t]hat's no good in court. We can't use it."

At the December 10 hearing, Deputy Bobby Lane testified that, during the course of his investigation of the Lefever murder, he never asked inmates to secretly record conversations with the appellant. Goney approached him with two tapes, but "[t]he tapes was garbage. There wasn't any use in keeping the tapes." Lane did not have any subsequent conversations with Goney about the tapes, nor did Lane talk to any other inmate. On December 22, 1992, the trial court denied the appellant's motion, observing, "I think it's a question of credibility for the jury to decide."

-49-

At trial, no tapes were introduced into evidence. However, Jimmy Myers and William Roger Moore testified. Jimmy Myers again stated that he had heard the appellant admit to killing Jodie Lefever. Bush also told Myers that "he was going to try to make people think he was crazy." Myers testified that these statements were not recorded, as the informants began taping the appellant only after the appellant's lawyers advised him against talking to fellow inmates about the murder. After the appellant was so advised, he changed his story several times. Finally, Myers insisted that he was never offered any form of compensation in return for his testimony. On cross-examination, he conceded that he had written a letter to an assistant district attorney, in which he stated, "If you can help me out in any way, I promise you that you will not be sorry."

Finally, William Roger Moore, another fellow inmate of Michael Bush following the appellant's incarceration at the Putnam County Jail, also testified at trial. Moore stated that, as there was very little to do at the jail, Bush approached him and initiated several conversations. The appellant admitted to Moore that he had killed Jodie Lefever. The appellant also stated that he was going to "make a ploy for craziness." Moore imparted this information to Special Agent O'Rear, an agent with the Tennessee Bureau of Investigation. Moore testified that he was not offered any compensation in return for his cooperation, nor did he ask for any compensation.

Again, the appellant argues that any incriminating statements made by the appellant to fellow inmates were elicited in violation of Massiah. We note, initially, that, because only Jimmy Myers and William Moore testified at trial, the denial of

the motion to suppress with respect to Goney and other inmates, even if erroneous, was harmless. See Hartman v. State, 896 S.W.2d 94, 100 (Tenn. 1995); State v. Sparks, 727 S.W.2d 480, 482 (Tenn. 1987), post-conviction relief granted, No. 03S01-9212-CR-00105 (Tenn. May 10, 1993). With respect to Myers and Moore, "the clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer v. Williams, 430 U.S. 387, 401, 97 S.Ct. 1232, 1240 (1977). Thus, in order to find a Massiah violation, a court must first determine (1) whether adversary proceedings had commenced; (2) whether the informant was a government agent; and (3) whether the agent "interrogated" the appellant within the meaning of Massiah.

The initiation of adversary proceedings is "marked by formal charge, which [has been] construe[d] to be an arrest warrant, or at the time of the preliminary hearing in those rare cases where a preliminary hearing is not preceded by an arrest warrant, or by indictment or presentment." State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980), cert. denied, 449 U.S. 845, 101 S.Ct. 128 (1980). Clearly, at the time the appellant allegedly made the incriminating statements to fellow inmates, he had been formally charged and, probably, indicted.[14]

It is arguably unclear whether Myers was acting as a government agent. This court in State v. Dunn, No. 85-356-III (Tenn. Crim. App. at Nashville, June 6,

---

[14]The appellant was arrested on September 25, 1988, and indicted the next day. The record does not reflect precisely when the appellant made the incriminating statements. However, the statements were made after the appellant's arrest and consequent incarceration in the Putnam County Jail.

1986) observed, "Although Massiah and it progeny do not explicitly define the term 'state agent,' the conduit in each of these cases was clearly a state agent, operating as such, when the conversations occurred."  Thus, any admissions made by the appellant before law enforcement officers became involved would, of course, be admissible.  Hartman, 896 S.W.2d at 100.  "[T]he Sixth Amendment is not violated whenever - by luck or happenstance - the State obtains incriminating statements from the accused after the right to counsel has attached."  Maine v. Moulton, 474 U.S. 159, 176, 106 S.Ct. 477, 487 (1985).

Again, at the suppression hearing, Goney testified that Deputies Burgess and Lane asked inmates, including Myers, to record conversations with the appellant.  However, Goney's testimony was largely contradicted by the testimony of both deputies and by the testimony of Myers.[15]  At trial, Myers recounted statements by the appellant, overheard prior to the recording of any conversations.  At the suppression hearing, Myers could not remember whether he heard these statements before or after first talking to Burgess and Lane.  Both deputies, for the most part, denied enlisting inmates to obtain statements from the appellant, although Deputy Burgess admitted that he might have asked Goney "to keep his ears open."

Even assuming that Myers was a state agent, the appellant at the suppression hearing also carried the burden of demonstrating "that the police and their informant took some action, beyond merely listening, that was designed

_____

[15] In any event, no tapes were ever introduced either at the suppression hearing or at trial.

deliberately to elicit incriminating remarks." Kuhlmann v. Wilson, 477 U.S. 436, 456, 459, 106 S.Ct. 2616, 2628, 2630 (1986). At the suppression hearing, Goney testified that he and Guy Ramsey recorded conversations with the appellant, during which they attempted, with Myers' assistance, to elicit and, indeed, fabricate a confession.[16] However, Myers testified that he did not participate in the recording of any statements. Rather, he testified both at the suppression hearing and at trial that he merely overheard the appellant confess to the murder of Ms. Lefever. There is no evidence in the record that this statement was made in response to efforts by the other inmates to stimulate conversation about the crime charged.

Given the conflicting testimony adduced at the suppression hearing, the record supports the trial court's denial of the appellant's motion with respect to Jimmy Myers. The findings made by the trial court after an evidentiary hearing are afforded the weight of a jury verdict; this court will not set aside the judgment of the trial court unless the evidence in the record preponderates against its findings. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994); State v. Dick, 872 S.W.2d 938, 943 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1993); State v. Killebrew, 760 S.W.2d 228, 233 (Tenn. Crim. App. 1988).

In any event, assuming for the sake of argument that Myers was a state agent and assuming that he "interrogated" the appellant within the meaning of Massiah, the admission at trial of Myers' testimony was harmless error. See

---

[16] Deputy Lane testified at the suppression hearing that the resultant tapes contained no incriminating evidence.

Hartman, 896 S.W.2d at 100; Sparks, 727 S.W.2d at 482. William Moore testified at trial concerning almost identical statements made by the appellant to him in the Putnam County Jail. The record is devoid of evidence that Moore was a state agent at the time of his conversations with Michael Bush, nor is there evidence that he made any effort to elicit statements from the accused about the crime charged. This issue is without merit.

5. **WHETHER THE TRIAL COURT ERRED IN OVERRULING THE APPELLANT'S OBJECTION TO THE INTRODUCTION OF CERTAIN PHOTOGRAPHS OF THE VICTIM.**

The appellant contends that the trial court erred in overruling his motion to suppress certain photographs of the victim. Specifically, he insists that the pictures were admitted only for the purpose of inflaming the jury, thus, their prejudicial effect outweighed their probative value. Additionally, the appellant argues that the photographs had no probative value in light of the vivid description of the victim's body given in Officer Lane's testimony.

During a jury-out hearing, the State attempted to present four photographs of the victim. Exhibit 25 was a photograph of the victim as she was discovered by Officer Lane. Exhibit 26 was a photograph which showed wounds to the victim's head. Exhibit 27 was a photograph which showed the lower dental plate of the victim on the floor next to her body. Exhibit 28 showed a wound to the victim's left knee. The State argued that the photographs were relevant to corroborate medical testimony, to aid the jury in determining the extent of the wounds, and to

establish the element of malice. The appellant responded that the pictures did not add to testimonial value as Officer Lane had already described the wounds in great detail. The appellant concluded that, moreover, the pictures were more prejudicial than probative.

The trial court accepted the State's argument that Exhibit 25 was probative to show the placement of the wounds on the body, Exhibit 27 was probative as to the amount of force that was used to dislodge the dental plate from the victim's mouth, and Exhibit 28 was probative to show additional wounds on the body. Furthermore, the trial court found that the probative value of these three photographs was not outweighed by their prejudicial effect. However, the trial court sustained the appellant's objection to Exhibit 26, finding it to be the most gruesome of the pictures, and finding it to not accurately depict the victim's wounds.

To be admissible, a photograph must be relevant to some issue at trial, and its prejudicial effect must not outweigh its probative value. State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978); see also Tenn. R. Evid. 403. The discretion of a trial judge in allowing the admission of a photograph into evidence will not be overturned except upon a dear showing of an abuse of discretion. State v. Bordis, 905 S.W.2d 214, 226 (Tenn. Crim. App. 1995) (citations omitted); see also State v. Stephenson, 878 S.W.2d 530, 542 (Tenn. 1994).

We conclude that it was not error to admit the photographs in this case. The photographs were relevant to supplement the testimony of the medical

examiner and the officer who initially investigated the crime scene in establishing the cause of death, see Stephenson, 878 S.W.2d at 542, and to show the brutality of the attack and extent of force used against the victim, from which the jury could infer malice. See State v. Brown, 836 S.W.2d 530, 551 (Tenn. 1992). This issue is without merit.

6.  **WHETHER THE APPELLANT IS ENTITLED TO RELIEF BASED ON ALLEGATIONS OF PROSECUTORIAL MISCONDUCT.**

### A.  LACK OF REMORSE

The appellant first argues that the prosecutor erroneously elicited testimony concerning the appellant's lack of remorse from three witnesses. When questioned by the prosecutor as to whether the appellant had expressed any remorse for what he had done, William Roger Moore, an inmate who had been incarcerated with the appellant, answered that the appellant had expressed remorse only in that he had gotten caught. When asked whether he had observed any sadness on the part of the appellant when the appellant had shown him a newspaper account of the murder, James Mullins, a friend of the appellant, testified that he had observed no sadness. When asked whether the appellant had expressed any remorse or sadness for what he had done, Shelia Bush (Hammock) testified that he had expressed no remorse.

The failure of defense counsel to make a contemporaneous objection

waives consideration of the issue on appeal.  See Teague v. State, 772 S.W.2d 915,926 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1989); State v. Killebrew, 760 S.W.2d 228, 235 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1988); Tenn. R. App. P. 36(a).  A review of the record reveals that of the three statements to which the appellant now objects, the appellant only objected to the prosecutor's question to James Mullins, and the objection was based on the fact that it was a leading question.  We conclude that the appellant has waived this issue.

## B.  IRRELEVANT OPINION EVIDENCE

The appellant next contends that the prosecutor erred in eliciting irrelevant opinion evidence from Jimmy Myers, another inmate who had been incarcerated with the appellant.  On redirect examination, the prosecutor asked Myers why he was in court testifying.  Myers responded that it "could be my mother or my grandmother, someone that's you know, laying there dead you know.  I don't think someone should kill someone like that and just walk the streets.  Get out scot free."

The appellant contends that the prosecutor deliberately brought before the jury evidence which was wholly irrelevant to the appellant's guilt or innocence. However, the record reveals that on cross-examination, appellant's counsel questioned Myers extensively concerning his true motivation for testifying.  We conclude that the question asked by the prosecutor was appropriate, notwithstanding the witness' nonresponsive statement. This issue is without merit.

## C.  CLOSING ARGUMENT

## (1) MASSIVE INVESTIGATION

The appellant also argues that he is entitled to a reversal of his conviction due to prosecutorial misconduct during closing argument.  He objects to the prosecutor's remark that the investigation was "the most extensive investigation ... that I've ever heard of" and to the prosecutor's statement that the appellant was the only suspect resulting from the investigation.  The appellant contends that evidence of such an investigation was not before the jury, and that the prosecutor's comments exceeded the scope of proper argument.

Our supreme court has observed that "argument of counsel is a valuable privilege that should not be unduly restricted.  Our courts seek to give great latitude to counsel in expressing their views of the case to the jury."  Smith v. State, 527 S.W.2d 737, 739 (Tenn. 1975).  See also  State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994).  The trial judge has wide discretion in controlling the argument of counsel.  Smith, 527 S.W.2d at 739.  Generally, on appeal, this court will not interfere with the exercise of that discretion in the absence of abuse thereof.  Id.  However, if the prosecutor's remarks, in fact, "stray[ed] beyond the wide latitude afforded," this court should consider, among other factors, the intent of the prosecutor, any curative measures undertaken by the court, the improper conduct viewed in context and in light of the facts and circumstances of the case, the cumulative effect of the remarks with any other errors in the record, and the relative strength or weakness of the case.  Bigbee, 885 S.W.2d at 809;  Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).  We note that "curative

instructions will not render all improper comments harmless;  the test is whether the conduct ... affected the results to the prejudice of the appellant." State v. Byerley, 658 S.W.2d 134, 139 (Tenn. Crim. App. 1983). See also Bigbee, 885 S.W.2d at 809.

In arguing that the investigation was extensive, the prosecutor specifically referred to Deputy Richard Smith's testimony that the Sheriff's Department had interviewed between 200 and 250 people regarding this case.  The prosecutor's observation, that the appellant was the only suspect, was similarly supported by the evidence introduced at trial.  We conclude that the trial court did not abuse its discretion in allowing the argument.

### (2) PROSECUTOR'S PERSONAL VIEWS

The appellant next contends that the prosecutor erred in referring to this murder as being "a murder of the worst kind," "one of the worst kind of murders imaginable," and "a most heinous and brutal act."  The appellant contends that the prosecutor expressed his personal views of the offense in an effort to inflame the passions of the jury.

However, evaluating the prosecutor's comments in light of his entire argument, we conclude that the comments referred to the fact that the appellant took advantage of a lady who was a close friend of his grandmother.  Even if improper, we do not view this argument as being so prejudicial as to require a

new trial.  This issue is without merit.

## D.  BOLSTERING

Finally, the appellant contends that the prosecutor erred by improperly bolstering the testimony of William Roger Moore and Shelia Bush (Hammock) by asking them if they were telling the truth.  He also asked Ms. Bush if she was having dreams about the case.

In State v. Carpenter, 773 S.W.2d. 1, 11 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1989), this court held that bolstering was permitted to rehabilitate an impeached witness to rebut the inference that the witness's testimony was a recent fabrication.  Bolstering has also been permitted to allow seemingly inconsistent statements to be placed into context.  State v. Boyd, 797 S.W.2d 589, 594 (Tenn. 1990).  We conclude that the prosecutor's questions were not inappropriate.

The question asked of Ms. Bush concerning whether she had dreams about the offense were posed in the context of remembering things that she had not thought of and explaining why there had been inconsistencies in previous statements.  Again, we conclude that the prosecutor could use this question to rehabilitate his witness.  This issue is without merit.

7.      WHETHER THE PROSECUTOR'S STATEMENTS DURING THE
        CLOSING ARGUMENT OF THE PENALTY PHASE OF THE TRIAL

**DENIED THE APPELLANT A FAIR TRIAL.[17]**

**A. <u>CALDWELL</u> VIOLATION**

The appellant first contends that the prosecutor, in violation of the Supreme Court's holding in <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 328-29, 105 S.Ct. 2633, 2639 (1985), "led the jury to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." The appellant cites the following portion of the prosecutor's argument to the jury:

> I submit to you that the most important day in the defendant's life was the day that he chose -- not you; not I; -- the day that he chose to go to the home of Jodie Lefever and murder her horribly, heinously, atrociously, in cold blood. They'll tell you that you have a choice to make here today, that is his life is literally in your hands. And I submit to you, ladies and gentlemen of the jury, that's not true. When he went to the home of Jodie Lefever and had her open the door as a friend, he took his life in his own hands. He took his life in his own hands.

When reviewing an alleged <u>Caldwell</u> error, this court must first determine whether the prosecutor's comments minimized the jury's role in determining the appropriateness of death. <u>State v. West</u>, 767 S.W.2d 387, 399 (Tenn. 1989), <u>cert. denied</u>, 497 U.S. 1010, 110 S.Ct. 3254 (1990). If the prosecutor's comments were improper, we must then decide whether the trial judge's instructions to the jury sufficiently corrected the error. <u>Id</u>. "If the Court cannot say the comments had no effect on the sentencing, then the jury's decision does not meet the standard of reliability required by the Eighth Amendment." <u>State v. Irick</u>, 762 S.W.2d 121, 131 (Tenn. 1988), <u>cert. denied</u>, 489 U.S. 1072, 109 S.Ct. 1357 (1989).

---

[17] <u>See supra</u> Section III, Issue #6 "Whether the Appellant is Entitled to Relief Based on Allegations of Prosecutorial Misconduct," (C)(1) Closing Argument, Massive Investigation, for a general discussion of the standard to be applied in reviewing counsel's argument.

We have previously observed that the State may properly argue that a defendant is the "author of his own fate." Wright v. State, No. 01C01-9105-CR-00149 (Tenn. Crim. App. at Nashville), perm. to appeal denied, (Tenn. 1994), cert. denied, _ U.S. _, 115 S.Ct. 1129 (1995). In any case, the prosecutor's comments must be evaluated in the context of the total argument by the parties and, of course, the trial court's instructions to the jury about its obligations under the law. See State v. Nichols, 877 S.W.2d 722, 733 (Tenn. 1994), cert. denied, _ U.S. _, 115 S.Ct. 909 (1995).

Immediately following the quoted portion of the prosecutor's argument, the prosecutor reminded the jurors that they had been asked during voir dire whether they would be able to impose the death penalty if the State were able to prove that aggravating factors outweighed any mitigating factors. The prosecutor then reviewed the aggravating circumstances presented by the State. During rebuttal argument, the prosecutor again explained the weighing process, remarking, "You have a job to do and it's a serious job. It's probably one of the most tough things that you've ever been called upon to do in your life." Defense counsel, during closing argument, emphasized the importance of the jury's role in determining the appropriate punishment. Defense counsel observed, "The verdict you render on the question you have today is whether a young man lives or dies. You are the supreme decision makers in this case." Finally, immediately before the jury began deliberations, the trial court correctly instructed the jury as to their responsibility for determining the appropriate punishment. We conclude, therefore, that even if the prosecutor's comments, by themselves, violated Caldwell, the error was harmless beyond a reasonable doubt.

-62-

## B. PROSECUTORIAL EXPERTISE

The appellant next contends that the prosecutor alluded to prosecutorial expertise when she asked that the jury impose the death penalty. That is, the prosecutor, according to the appellant, argued that the jury should impose the death penalty because the State, in its expertise, chose to seek the death penalty. However, the record reveals that, in the portion of the argument to which the appellant refers, the prosecutor merely reviewed the facts of the case and concluded that "[i]f that's not a set of circumstances that deserves the death penalty, one would wonder what it takes." We conclude that the prosecutor's argument did not rely upon prosecutorial expertise, and that this issue is without merit.

## C. DENIGRATION OF MITIGATING EVIDENCE

The appellant also contends that the prosecutor misled and inflamed the jury by denigrating the appellant's mitigating evidence, characterizing the evidence as an "excuse" which should be disregarded. First, our supreme court found "nothing wrong with counsel's argument" in State v. Smith, 893 S.W.2d 908, 922 (Tenn. 1994), cert. denied, __ U.S. __, 116 S.Ct. 99 (1995), a case in which the prosecutor similarly referred to the defendant's mitigating evidence as an excuse. See also State v. Keen, No. 02S01-9112-CR-00064 (Tenn. May 23, 1994), rehearing granted, (Tenn. May 16, 1995). Second, the record reveals that, although the State generally downplayed the mitigating evidence presented by the appellant, the prosecutor, during rebuttal, conceded that two mitigating factors, the appellant's youth and his lack of a significant criminal history, had been proven. During the course of argument, the prosecutor also explained that the

-63-

appellant could "present proof on anything [he] want[s] to and call it a mitigator. Whether it's a mitigator or not is up to you." We conclude that the challenged comments do not rise to the level of reversible error.

## D. MERCY

The appellant next contends that the prosecutor attempted to discourage the jury's consideration of mercy. Specifically, in rebuttal, the prosecutor argued, "We want you to use the same mercy that this defendant used on Jodie Lefever as she lay helpless in her floor." Our supreme court has observed that this argument "encourage[s] the jury to make a retaliatory sentencing decision, rather than a decision based on a reasoned moral response to the evidence," and is therefore improper. Bigbee, 885 S.W.2d at 812. However, the record reveals that the trial court sustained the appellant's objection to the prosecutor's remark. Moreover, at the conclusion of argument, the trial court instructed the jury that they could "decide to sentence the appellant to life imprisonment simply because based on the evidence introduced at either the guilt/innocence or sentencing phase at this trial you find it appropriate to exercise mercy." We conclude that the appellant was not unduly prejudiced by the prosecutor's statement.

## E. MISCELLANEOUS

The appellant complains that the prosecutor waived the murder weapon before the jury. He also asserts that the prosecutor improperly argued that the death penalty would protect all the "other Jodie Lefevers of the world." Finally, the appellant argues that the prosecutor, during argument, impermissibly

remarked that the appellant's expert witnesses received a fee for their services.

First, the murder weapon was properly introduced into evidence at trial and, therefore, could be displayed to the jury and otherwise referred to during the State's closing argument. Moreover, the prosecutor is an advocate and is entitled to pursue his role with thoroughness and vigor. Post v. State, 580 S.W.2d 801, 808 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1979). Second, although argument based on general deterrence and, perhaps, deterrence of the defendant, is in fact improper, see Irick, 762 S.W.2d at 131, the trial court sustained the appellant's objection to the prosecutor's remark. Finally, with respect to any remarks addressing fees paid to expert witnesses, Tenn. R. Evid. 616 provides, "A party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Thus, in cross-examining the appellant's expert witnesses during trial, the prosecutor properly inquired about fees. Therefore, the prosecutor's statements during closing argument were grounded in the proof presented at trial.

"Closing argument must be temperate, must be predicated on evidence introduced during the trial of a case, and must be pertinent to the issues being tried." State v. Odom, No. 02C01-9305-CR-00080 (Tenn. Crim. App. at Jackson, October 19, 1994), perm. to appeal granted, (Tenn. 1995). See also State v. Tyson, 603 S.W.2d 748, 754 (Tenn. Crim. App. 1980). We conclude that the State's argument largely complied with this standard, and that the trial court did not abuse its discretion in controlling closing argument during the penalty phase

-65-

of the trial.  This issue is without merit.

8.      **WHETHER THE TRIAL COURT PROPERLY CHARGED THE
         JURY REGARDING THE CREDIBILITY OF WITNESSES.**

        The appellant contends that the jury instructions given by the trial judge

regarding the credibility of witnesses, the impeachment of witnesses, and the

method of resolving conflicts in the testimony of witnesses unconstitutionally

restrained the jury in their determination of credibility.

        The instructions about which the appellant complains are the pattern jury

instructions for the credibility of witnesses and the impeachment of witnesses.

T.P.I. -- Crim. § § 37.01, 37.02.  Both of these instructions have been held by this

court to be a proper statement of the law.  See State v. Glebock, 616 S.W.2d 897,

906 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1981).  We conclude that

this issue is without merit.

9.      **WHETHER THE APPELLANT WAS PROPERLY CONVICTED OF
         FIRST DEGREE BURGLARY.**

                        **A. INSUFFICIENT EVIDENCE**

        The appellant contends that there was insufficient evidence to

convict him of first degree burglary.  He specifically claims that the State failed to

prove that there had been a "breaking and entering" of the victim's house.  The

standard of review regarding the sufficiency of the evidence outlined in the appellant's second issue will be used to evaluate this contention also. <u>See</u>, *supra*, Section III, Issue #2 "Whether the trial court erred in overruling the appellant's motion for judgment of acquittal as to the charge of premeditated murder.".

Tenn. Code Ann. § 39-3-401 (1988) defined first degree burglary as "the breaking and entering into a dwelling house . . . by night, with intent to commit a felony." The trial court properly instructed the jury that "[a]ny person who after having entered the premises mentioned in §39-3-401, with intent to commit a felony, shall break any premises, or any safe or receptacle therein, shall receive the same punishment as if he had broken into the premises in the first instance." <u>See</u> Tenn. Code Ann. § 39-3-402 (1988).

The appellant contends that the evidence demonstrated that the appellant had been granted entry by the victim. However, the breaking element can be either actual or constructive, and if entry was gained by either fraud or threat, the breaking will be considered constructive. <u>State v. Holland</u>, 860 S.W.2d 53, 58 fn. 11 (Tenn. Crim. App. 1993). Since the appellant was armed with a piece of wood, there was at least circumstantial evidence that the appellant gained entry by threat. Likewise, because the victim knew the appellant, entry could have been gained by fraud if the appellant told her that he was there for legitimate business.

Moreover, in consideration of Tenn. Code Ann. § 39-3-402, the State proved that the top right-hand dresser drawer had been opened and that the

appellant had opened the kitchen drawer to remove the butcher knife. Based upon these facts, we conclude that a rational trier of fact could have found the appellant guilty of first degree burglary.

## B. VARIANCE

The appellant next argues that he was denied notice of the charges being brought against him because the indictment charged the breaking and entering into the home while the proof demonstrated only the breaking into the drawers of the home. He further contends that he was denied due process and a fair trial because he was convicted on a charge never made in the indictment.

In order to satisfy constitutional requirements, an indictment must provide the defendant with notice of the offense charged, provide the court with an adequate ground upon which a judgment may be entered, and provide the defendant with protection against double jeopardy. State v. Byrd, 820 S.W. 2d 739, 741 (Tenn. 1991). Moreover, in State v. Moss, 662 S.W.2d 590, 592 (Tenn. 1984), the Tennessee Supreme Court held that a variance between the proof and the indictment did not prejudice the defendant's rights if the indictment sufficiently informed the defendant of the charges against him so that he could properly prepare his defense and not be misled or surprised at trial and if the variance was not such that it would present a danger that the defendant could be prosecuted a second time for the same offense.

In this case, the appellant was aware of the facts surrounding the entry into

Ms. Lefever's home and the entry into the two drawers of her home. Although the appellant contends that he was surprised at trial, he has not demonstrated how he could have better defended had he been given prior notice that the breaking involved breaking into the drawers. All of the activity was involved in one criminal episode. For these reasons we conclude that, even if a variance existed, it was harmless under these circumstances. This issue is without merit.

**11.     WHETHER THE APPELLANT WAS GIVEN PROPER NOTICE OF THE AGGRAVATING CIRCUMSTANCES UPON WHICH THE STATE INTENDED TO RELY.**

The appellant contends that he was not provided sufficient notice of the facts supporting the aggravating circumstance that "[t]he murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another." Although the appellant requested a bill of particulars for information concerning this circumstance, the State did not reply.

Tenn. R. Crim. P. 7(c) allows the court to direct the filing of a bill of particulars "so as to adequately identify the offense charged." "This provision is to be construed to serve that singular purpose, and is not meant to be used for purposes of broad discovery." (emphasis added) Advisory Commission Comments, Tenn. R. Crim. P. 7. See also State v. Stephenson, 878 S.W.2d 530 (Tenn. 1994); State v. Wiseman, 643 S.W.2d 354 (Tenn. Crim. App. 1982). Therefore, Rule 7(c) is not applicable to the sentencing phase of the proceedings.

Tenn. R. Crim. P. 12.3(b) requires the State to provide notice of its intent to seek the death penalty no less than thirty days prior to trial. The rule also requires the State to specify the aggravating circumstances upon which it tends to rely at the sentencing hearing. Specification may be satisfied by a citation to the aggravating circumstance. Tenn. R. Crim. P. 12.3(b).

In the present case, the State amended its notice to seek the death penalty to include the subsection (i)(6) aggravating factor on November 5, 1992, well within the statutorily mandated time period.[18] This issue is without merit.

**14.   WHETHER THE TRIAL COURT PROPERLY INSTRUCTED THE JURY "REGARDING REASONABLE DOUBT."**

The appellant contends that he was denied his rights under Article I, Sections 6, 7, 8, 16, 17, and 18 of the Tennessee Constitution, and the Sixth, Eighth and Fourteenth Amendments to the United States Constitution because the jury was unconstitutionally instructed concerning the meaning of "reasonable doubt" at the guilt and sentencing phase of the trial. At the guilt phase of the trial, the jury received the following instruction concerning the meaning of "reasonable doubt."

> Reasonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily as to the certainty of guilt. Reasonable doubt does not mean a

---

[18]The appellant's trial was set for February of 1993.

captious, possible, or imaginary doubt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required, and this certainty is required as to every element of proof necessary to constitute the offense.

(charge of the court, transcript of the evidence, vol. five, § III, p. 681).[19]

The appellant argues that this instruction equating "beyond a reasonable doubt" with "a moral certainty" violated his due process rights under the new standard set forth in Victor v. Nebraska, --- U.S. ---, 114 S.Ct. 1239 (1994). In Victor, the United States Supreme Court ruled that the phrase "moral certainty" may have lost its historical meaning, and that a jury might "understand it to allow conviction on proof that does not meet the beyond a reasonable doubt standard." Victor, --- U.S. at ---, 114 S.Ct. at 1247. It reasoned that "'moral certainty,' standing alone, might not be recognized by modern jurors as a synonym for 'proof beyond a reasonable doubt,' " but "something less than the very high level of probability required by the Constitution in criminal cases." Id. While the Court stated that it did not condone the use of the "moral certainty" phrase, the Court held that the phrase could pass constitutional muster if used in conjunction with a modifying instruction that lent meaning to the phrase. Victor, --- U.S. at ---, 114 S.Ct. at 1248.[20] In order to meet the requirements of due

[19]We also note that, at the sentencing phase of the trial, the jury was likewise instructed as to "a moral certainty" regarding the finding of aggravating circumstances "beyond a reasonable doubt." (charge of the court, transcript of the evidence, vol. eight, § III, pp. 1153-1154).

[20]The United States Supreme Court, in Cage v. Louisiana, 298 U.S. 39, 41, 111 S.Ct. 328, 329 (1990), held that "moral certainty" modified by the phrases "grave uncertainty" and "actual substantial doubt" did not meaningfully convey the definition of reasonable doubt, and, thus, violated the due process clause.

process, the jury instructions must be examined as a whole, without considering particular phrases out of context.  Victor, --- U.S. ---, 114 S.Ct. at 1243.

The instruction provided to the jury in the present case used the term "moral certainty" in conjunction with "let the mind rest easily" and "arise from possibility."  Though neither of these phrases have been before the United States Supreme Court,[21] the courts of this state have consistently upheld the constitutionality of this instruction.  See  State v. Nichols, 877 S.W. 2d 722 (Tenn. 1994), cert. denied, --- U.S. ---, 115 S.Ct. 909 (1995); Pettyjohn v. State, 885 S.W.2d 364 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1994); State v. Beckham, No. 02C01-9405-CR-00107 (Tenn. Crim. App. at Jackson, Sept. 27, 1995);  Caldwell v. State,  No. 02C01-9405-CR-00107 (Tenn. Crim. App. at Jackson, Dec. 28, 1994), perm. to appeal granted in part, denied in part, (Tenn. May 30, 1995);  State v. Voaden, No. 01C01-9305-CC-00151 (Tenn. Crim. App. at Nashville, Dec. 22, 1994), perm. to appeal denied, (Tenn. May 1, 1995);  Smith v. State, No. 03C01-9312-CR-00393 (Tenn. Crim. App. at Knoxville, July 1, 1994).  Specifically, the Tennessee Supreme Court noted in State v. Nichols, 877 S.W.2d at 734, that "the use of the phrase 'moral certainty' by itself is insufficient to invalidate an instruction on the meaning of reasonable doubt."  The court distinguished the Tennessee instruction from the one invalidated in Cage v. Louisiana because the Tennessee instruction does not require "grave uncertainty" to support acquittal.  Moreover, the court concluded

---

[21]We note, however, that a federal district court has recently held that the phrase "let the mind rest easily," when used to qualify "moral certainty," does not sufficiently convey to the jury the requisite burden of proof required by the Constitution.  See  Rickman v. Dutton, 864 F.Supp. 686 (M.D. Tenn. 1994).  We are not, however, bound by that court's decision.

that:

> [w]hen considered in conjunction with an instruction that "[r]easonable doubt is that doubt engendered by an investigation of all the proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of your verdict," we find that the instruction properly reflects the evidentiary certainty required by the "due process" clause of the federal constitution and the "law of the land" provision in our state constitution.

Nichols, 877 S.W.2d at 734. We, therefore, conclude that the charge given by the trial court, although containing the phrase "moral certainty," did not violate the appellant's rights under the United States or the Tennessee Constitutions.

### 15.   WHETHER THE TRIAL COURT'S INSTRUCTIONS IN THE PENALTY PHASE PROHIBITED THE JURY FROM CONSIDERING AND GIVING FULL EFFECT TO THE APPELLANT'S MITIGATING EVIDENCE.

#### A. MODIFIER "EXTREME"

The appellant first contends that the jury instructions precluded the jury from considering mitigating evidence of mental or emotional disturbance which did not rise to the level of extreme mental or emotional disturbance. In its jury instructions, the trial court recited the language of Tenn. Code Ann. § 39-2-203(j)(2) in instructing the jury that in arriving at the punishment the jury shall consider the mitigating factors including, but not limited to that "[t]he murder was committed while the defendant was under the influence of extreme mental or emotional disturbance." The appellant contends that use of the modifier "extreme" misled the jury in its consideration of the evidence.

The Tennessee Supreme Court rejected this same argument in State v.

Smith, 857 S.W.2d 1, 16-17 (Tenn.), cert. denied, --U.S.--, 114 S. Ct. 561 (1993). Moreover, in the case at bar, the jury was also instructed that it could consider any mitigating factor raised by the evidence at either the guilt or penalty phase of the trial. This issue is without merit.

## B. MODIFIER "SUBSTANTIALLY"

The appellant also contends that the jury instructions precluded the jury from considering mitigating evidence of mental illness and intoxication which did not rise to the level of "substantially" affecting the appellant's ability to conform his conduct to the law. Again, this argument was rejected in Smith, 857 S.W.2d at 16-17, and we find the issue to be without merit.

## C. UNANIMOUS AGREEMENT ON MITIGATING CIRCUMSTANCES

Lastly, the appellant contends that the trial court unconstitutionally limited the consideration of mitigating evidence by requiring the jury to unanimously agree on a verdict of life or death. This argument was rejected in Smith, 857 S.W.2d at 18, and we agree that "nothing in the Tennessee statutes, and the instructions given the jury, or in the verdict form submitted to the jury, was likely to lead any juror to believe that he or she was precluded from considering mitigating circumstances unless all jurors agreed that the circumstances existed." This issue is without merit.

16.    WHETHER THE TRIAL COURT FAILED TO PROVIDE THE
       JURY WITH PROPOSED INSTRUCTIONS NECESSARY FOR
       THE PROPER DETERMINATION OF SENTENCE.

The appellant contends that the trial court erred in refusing to give certain requested jury instructions during the penalty phase of the trial.  The trial court rejected the following special instructions:

1.(2)   Burden of proof -generally;
2.(4)   Life means life -death means death -sentence will be carried out
3.(5)   Definition of life and death - sentencing;
4.(6)   Jury has responsibility for final decision - sentencing;
5.(7)   Decision to be made by individual jurors - sentencing;
6.(9)   Aggravating circumstance - definition - sentencing;

7.(10) Weighing aggravation and mitigation - defining mitigation - sentencing;
8.(13) Aggravating circumstance - standards for consideration - sentencing;
9.(14) Presumption regarding aggravating circumstances - sentencing;
10.(15)Aggravating circumstances - unanimity - sentencing:
11.(16)Aggravating circumstance - individual consideration but requirement of unanimity - sentencing;
12.(18)Sentence - crime in society;
13.(19)Deterrence - cost sentencing;
14.(20)Definition - weight and unanimity - sentencing;
15.(21)Definition - mitigating circumstances - sentencing;
16.(22)Mitigating circumstance - definition -sentencing;
17.(23)Mitigating circumstance - definition -sentencing;
18.(24)Standard of proof - sentencing;
19.(26)Weighing aggravating and mitigating circumstances - sentencing;
20.(27)Doubt inures to the benefit of the defendant - sentencing;
21.(28)Mercy - sentencing;
22.(29)Consideration for sentence less than death - sentencing;
23.(30)Mitigation - reason for sentence less than death - sentencing;
24.(31)Sympathy - sentencing;
25.(32)Compassion - mercy - sentencing;
26.(33)Mitigation - reason for sentence less than death - sentencing;
27.(34)Mitigating circumstances - basis for sentence less than death - sentencing;
28.(35)Imposing a sentence less than death;
29.(36)May vote life - sentencing;
30.(37)Finding beyond a reasonable doubt that death is appropriate - sentencing;
31.(38)Lingering doubt -sentencing;
32.(39)Jury verdict - inability to agree - sentencing;
33.(40)No evidence except that introduced at trial - sentencing;
34.(42)Mitigating circumstance - age - sentencing;

35.(44)Mitigating circumstance - mental illness - sentencing;
36.(46)Mitigating circumstance - capacity to appreciate criminality - sentencing;
37.(47)Mitigating circumstance - emotional development - sentencing;
38.(50)Mitigating circumstance - adolescent - sentencing;
39.(51)Mitigating circumstance - parental expectations - sentencing;
40.(53)Mitigating circumstance - health of another - sentencing;
41.(54)Mitigating circumstance - domination - sentencing;
42.(55)Mitigating circumstance - planning of crime - sentencing;
43.(56)Mitigating circumstance - death of victim - sentencing;
44.(57)Mitigating circumstance - lingering doubt - sentencing.

When a trial court's instructions correctly charge the applicable law, the court does not err by refusing special requests. Tillet v. State, 565 S.W.2d 509, 511(Tenn. Crim. App. 1978). Nor is it error to refuse to give an inaccurate special request. State v. Moore, 751 S.W.2d 464, 467 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1988). After reviewing the instructions given by the trial court, we conclude that the instructions adequately charge the applicable law. This issue is without merit.

17.    WHETHER THE DEATH PENALTY UNCONSTITUTIONALLY INFRINGES UPON THE APPELLANT'S FUNDAMENTAL RIGHT TO LIFE.

The appellant contends that the Tennessee death penalty statute is unconstitutional in that the right to life is fundamental and the punishment of death is not necessary to promote any compelling state interest. The appellant argues that less severe penalties are available to serve the state's interest in punishing the appellant. Moreover, the appellant asserts that "compelling state interests are those which secure our democratic institutions and/or insure national security." While this argument is somewhat novel in its approach, we

note that one of the state's most basic functions is to enforce the penal laws as established by the legislature. We quote from the United States Supreme Court decision, Gregg v. Georgia, 428 U.S. 153, 183, 96 S.Ct. 2909, 2930 (1976):

> [C]apital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

The Tennessee Supreme Court has held that the state's death penalty statute, per se, meets due process requirements. See State v. Black, 815 S.W. 2d 166, 190 (Tenn. 1991); see also State v. Groseclose, 615 S.W.2d 142 (Tenn.), cert. denied, 454 U.S. 882, 102 S.Ct. 366 (1981). This issue is therefore without merit.

## 18. WHETHER THE STATE'S DEATH PENALTY STATUTE IS CONSTITUTIONAL.

The appellant raises several constitutional objections to the Tennessee death penalty statute. Specifically, the appellant contends that the death penalty statute is unconstitutional in that:

(a) it provides insufficient guidance to the jury concerning who has the burden of proving whether mitigation outweighs aggravation and what standard the jury should use in making that determination;

(b) it fails to sufficiently narrow the class of death penalty eligible defendants;

(c) it insufficiently limits the jury's discretion in that once it finds an aggravating circumstance beyond a reasonable doubt, it can impose death, regardless of what mitigation is shown;

(d) it requires that if the jury finds that the aggravating circumstances outweigh the mitigating circumstances, it must impose death;

-77-

(e) it allows the jury to afford too little weight to non-statutory mitigating factors. The statute requires that the jury consider "any mitigating circumstances";

(f) it does not require the jury to make the ultimate determination that death is appropriate in that it is "merely filling in the blanks" in determining and comparing mitigating and aggravating circumstances.;

(g) it does not inform the jury of its ability to impose mercy;

(h) it provides no requirement that the jury make findings of fact as to the presence or absence of mitigating circumstances, thereby preventing effective appellate review;

(i) it prohibits the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase of the trial;

(j) it allows the imposition of a cruel and unusual punishment and in that it allows death to be imposed by electrocution;

(k) it has been imposed discriminately on the basis of race, sex, geographic region, and economic and political status of the defendant;

(l) the proportionality of arbitrariness review conducted by the Tennessee Supreme Court pursuant to Tenn. Code Ann. § 39-13-205 is inadequate and deficient;

(m) it permits the introduction of relatively unreliable evidence in the State's proof of aggravating circumstances and in its rebuttal of mitigating circumstances;

(n) it allows the State to make final closing arguments to the jury in the penalty phase of the trial;

All of the appellant's arguments except (g) have been rejected by the Tennessee Supreme Court.  See State v. Cazes, 875 S.W.2d 253, 268-269 (Tenn. 1994); State v. Smith, 857 S.W.2d 1, 16-17, 23 (Tenn. 1993); State v. Howell, 868 S.W.2d 238, 258 (Tenn. 1993); State v. Black, 815 S.W.2d 166, 185, 187 (Tenn. 1991); State v. Boyd, 797 S.W.2d 589, 596 (Tenn. 1990); State v. Melson, 638 S.W.2d 342, 366, 368 (Tenn. 1982); State v.  Groseclose, 615 S.W.2d 142, 150  (Tenn. 1981).  With respect to the argument in (g), in

consideration of the jury instructions given in a capital case, we find this issue to be without merit.

## 19. WHETHER THE CUMULATIVE EFFECT OF ALL ERRORS VIOLATE THE APPELLANT'S CONSTITUTIONAL RIGHTS.

As his final argument, the appellant contends that the cumulative effect of all errors alleged both at trial and at sentencing violates his constitutional rights. As this court has not found any error with respect to the appellant's previous eighteen issues, we find this final issue to be without merit.

IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE

FILED

April 7, 1997

Cecil Crowson, Jr.
Appellate Court Clerk

STATE OF TENNESSEE,               (

                                  (

    Plaintiff-Appellee,        (

                                  (

                                  (  Cumberland County

v.                                (

                                  (  Hon. Leon Burns, Jr., Judge

                                  (

                                  (  No. 03-S01-9604-CC-00047

MICHAEL DEAN BUSH,                (

                                  (

    Defendant-Appellant.       (

CONCURRING OPINION

I concur in affirming the conviction of first degree murder and the sentence of death in this case.

I write separately to state my reasons for not finding as prejudicial error the trial court's charging of the 1989 version of aggravating circumstance (i)(5), to express my continuing concern regarding the Court's comparative proportionality review, and to comment on a disturbing aspect of the case which is insulated from review.

First, I repeat an observation made in State v. Howell, 868 S.W.2d 238, 263 (Tenn. 1993) (Reid, C.J., concurring), which is applicable to the performance of the trial judge in this case: "The trial judge demonstrated the qualities critically important in conducting a highly emotional and legally exacting trial. The record shows that the case was decided by a competent and impartial jury. The record demonstrates that capital cases can be tried relatively free of error." Counsel pressed to the line the wide latitude necessary for effective advocacy but were appropriately restrained by the cool hand of the judge. The case also demonstrates that having a review by the Court of Criminal Appeals of all assignments of error in capital

cases, with a final review by this Court of a limited number of issues in addition to those issues mandated by statute, is an efficient utilization of judicial resources.

The State relied upon, and the jury found, aggravating circumstance (i)(5). The offense in this case was committed in 1988; the trial was held in 1993. At the time the offense was committed, aggravating circumstances (i)(5) was defined as a murder that "was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5) (1982). In 1989, that definition was amended by deleting "depravity of mind" and substituting "serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1991). Without objection, the trial court charged the 1989 version of the statute.

The Court held in State v. Brimmer, 876 S.W.2d 75, 82 (Tenn. 1994), that in capital cases the applicable law is the law that was in effect at the time the offense was committed. The defendant insists that charging the 1989 definition was reversible error. There can be no denying that under the authority of Brimmer, the instruction was

erroneous.[22]  However, in my opinion, the effect of the

error was ameliorative rather than prejudicial, and,

therefore, does not constitute reversible error.


I have dissented in every case decided by this

Court since September 1990 in which there was reliance for

the sentence of death on a finding that the murder involved

depravity of mind.  The basis of those dissents is that

every first degree murder is "especially heinous, atrocious

or cruel in that it involved depravity of mind";

consequently, that instruction has no reasonably precise

meaning and does not aid the jurors in determining if death

is an appropriate punishment.  In the first case, State v.

Black, 815 S.W.2d 166, 196-97 (Tenn. 1991) (Reid, C.J.,

concurring and dissenting), I suggested that:

> a proper limiting construction of
> "depravity of mind" to be given in those
> cases where torture is absent would be
> established by adopting the definition
> of that term set forth by the New Jersey
> Supreme Court in State v. Ramseur, 106
> N.J. 123, 524 A.2d 188, 230-231 (1987),
> where it held that this phrase marks
>
> society's concern to punish severely

---

[22]As noted in the main opinion, Brimmer was decided after this case
had been tried.

-83-

those who murder without purpose or meaning as distinguished from those who murder for a purpose (albeit a completely unjustified purpose). This term isolates conduct that causes the greatest abhorrence and terror within an ordered society, because citizens cannot either in fact or in perception protect themselves from these random acts of violence. The killer who does it because he likes it, perhaps even because it makes him feel better, who kills bystanders without reason, who kills children and others whose helplessness would indicate that there was no reason to murder, evinces what we define as depravity of mind.

. . .

What society is concerned with here . . . is the complete absence--from society's point of view--of any of the recognizable motivations or emotions that ordinarily explain murder.

In State v. Van Tran, 864 S.W.2d 465, 488 (Tenn. 1993) (Daughtrey, J., dissenting), I joined Justice Daughtrey in stating: "Because the "depravity of mind" prong of aggravated circumstance (i)(5) is so vague, the instruction given in this case allowed the jury to exercise the sort of unguided discretion condemned by the United States Supreme Court in Godfrey v. Georgia, 446 U.S. 420, 100 S. Ct. 1759,

-84-

64 L.Ed.2d 398 (1980), and <u>Maynard v. Cartwright</u>, 486 U.S. 356, 108 S. Ct. 1853, 100 L.Ed.2d 372 (1988)."

Having obviously failed to convince my colleagues of the correctness of my position, I stated the matter a bit more firmly in <u>State v. Shepherd</u>, 902 S.W.2d 895, 909 (Tenn. 1995) (Reid, J., dissenting):

> As stated in prior dissents, the words "heinous, atrocious or cruel" are so bereft of particular meaning that this aggravating circumstance does not accomplish the constitutional mandate of directing and limiting the jury's discretion "so as to minimize the risk of wholly arbitrary and capricious action." <u>Gregg v. Georgia</u>, 428 U.S. 153, 189, 96 S. Ct. 2909, 2932, 49 L.Ed.2d 859 (1976); <u>see</u> <u>State v. Black</u>, 815 S.W.2d 166, 195 (Tenn. 1991). The precariousness of the Court's persistent reliance upon this patently invalid aggravating circumstance is indicated by the opinion of Justice Stevens in <u>Barber v. Tennessee</u>, _____ U.S. _____, 115 S. Ct. 1177, 130 L.Ed.2d 1129 (1995). In denying the capital defendant's petition for certiorari from the judgment of this Court denying post-conviction relief, Justice Stevens stated:
>
>> . . . In this case, for example, there are valid reasons for the Court's decision to deny review. But this does not mean petitioner's challenge to his death sentence, based in part upon the trial judge's definition of an

aggravating circumstance, lacks merit.
Under the trial court's instruction, a
jury could find an aggravating
circumstance sufficient to impose the
death penalty merely by concluding that
a murderer's state of mind was "wicked
or morally corrupt."  Because such a
state of mind is a characteristic of
every murder, the instruction is plainly
impermissible under this Court's
holdings in Godfrey v. Georgia, 446 U.S.
420, 428-429 [100 S. Ct. 1759, 1764-65,
64 L.Ed.2d 398] (1980) (striking down
instruction allowing jury to find
aggravating circumstance if murder was
"'outrageously or wantonly vile,
horrible and inhuman'"), and Maynard v.
Cartwright, 486 U.S. 356, 363-364 [108
S. Ct. 1853, 1858, 100 L.Ed.2d 372]
(1988) ("'especially heinous, atrocious,
or cruel'").

(Footnotes omitted.)


While "depravity of mind," in my view, is fatally

deficient in meaning, the language of the 1989 statute,

"serious physical abuse beyond that necessary to produce

death," is plain and provides a meaningful standard for

determining the appropriateness of death as a penalty.  As a

practical matter, then, the substantive effect of the "error"

in this case was to elide, or even to correct, the

unconstitutional portion of this aggravating circumstance.

The error was entirely technical and curative of those

-86-

constitutional defects which I have previously found in this aggravating circumstance and, under the facts of this case, the instruction gave the jury a constitutional equivalent to the prior unconstitutional version of aggravating circumstance (i)(5) found in Tenn. Code Ann. § 39-2-203(i)(5). I have not in any prior case, and I do not now, find that definition deficient as an aggravating circumstance. Consequently, I agree with the main opinion that giving the erroneous instruction to the jury is not grounds for reversal of the sentence.

Also, in some prior cases, I have insisted that the evidence did not support a finding of torture as an aggravating circumstance. See e.g., State v. Cazes, 875 S.W.2d 253, 272 (Tenn. 1994) (Reid, J., concurring and dissenting); State v. Van Tran, 864 S.W.2d 465, 483 (Tenn. 1993) (Reid, C.J., concurring and dissenting); State v. Black, 815 S.W.2d at 196. The facts of this case, as stated in the main opinion, clearly support a finding of torture as that term is generally understood. Perhaps it is noteworthy that the sufficiency of the evidence supporting this aggravating circumstance, though mandated by statute for review, Tenn. Code Ann. § 39-13-206(c)(1)(B) (Supp. 1996),

was not raised by the defendant.  Consequently, I concur in the holding that the evidence is sufficient to support the jury's finding of the torture component of aggravating circumstance (i)(5).

Another issue which, in my view, requires further discussion is the comparative proportionality review mandated by Tenn. Code Ann. § 39-13-206(c)(1)(D) (Supp. 1996); this issue has been the basis for prior dissent.  There is no methodology to the majority's analysis.  The review consists entirely of conclusory, and defensive, statements followed by a further recitation of the facts.  See State v. Nichols, 877 S.W.2d 722, 744 (Tenn. 1994) (Reid, C.J., dissenting); State v. Hurley, 876 S.W.2d 57, 71 (Tenn. 1993) (Reid, C.J., dissenting); State v. Howell, 868 S.W.2d at 271-72 (Reid, C.J., concurring); State v. Van Tran, 864 S.W.2d at 484-85 (Reid, C.J., concurring and dissenting); State v. Harris, 839 S.W.2d 54, 84-85 (Tenn. 1992)(Reid, C.J., dissenting).

Nevertheless, as in State v. Howell and State v. Smith, 868 S.W.2d 561, 585 (Tenn. 1993) (Reid, C.J., concurring), the record establishes that upon comparison of the character of the defendant and the nature of his crime,

to other defendants and other first degree murders, by any rational standard, the defendant is among the worst of the bad.

The character of the defendant and the circumstances of the killing in this case would justify the sentence of death judged by the definition of "depravity of mind" urged in State v. Black, see supra, at _____ [p. 4]. The defendant's conduct in killing an aged and helpless victim, who surrendered her last means of protection by opening the door of her home to the grandson of her best friend, is conduct which causes the greatest abhorrence and terror within an ordered society.  There is no protection against a random killing by a trusted acquaintance.  The character of the defendant shows more than a calculated robbery which got out of hand.  The evidence shows a person of intelligence who is fascinated with vampires and demons, who dreams of killing, and whose life is inhabited by demons and monsters.  His explanation of the homicide is disturbing; he was compelled by an underworld group.  But that fanciful compulsion is belied by his manner of performing the act so that he literally became drenched with the victim's blood and by the relish with which he recounted the crime to acquaintances.  As stated in Howell, 868 S.W.2d at 272, "comparison of the character of the defendant in this case and the nature of his crime, by any standard of analysis, would show that he is among the worst of the bad."

It is, in fact, the abundant evidence of the defendant's maleficence that is disturbing. The record contains significant evidence beyond the circumstances relating directly to the crime. The defendant has been exhibiting symptoms of schizophrenia since he was in high school and was diagnosed as a schizophrenic while awaiting trial. The record discloses that, based upon the assessment of court-appointed mental health experts, the trial court found that the defendant was incompetent to stand trial. Those same mental health professionals also found that an insanity defense could be supported. However, the defendant has not challenged the court's subsequent determination of competency, and the record discloses no facts upon which plain error can be found in this regard. Apparently, counsel was content to present evidence of the defendant's mental condition at the sentencing hearing. Since the record does not facially establish that the mental condition of the defendant is disproportionate to that of other defendants sentenced to death, this aspect of the case cannot effectively be reviewed on the record before the Court.

In conclusion, the record does not disclose reversible error, but rather, supports the judgment rendered in the trial court and affirmed by the Court of Criminal Appeals and this Court.

_____
Reid, J.

IN THE SUPREME COURT OF TENNESSEE

AT KNOXVILLE

FILED

**April 7, 1997**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | FOR PUBLICATION |
| | ) | |
| Appellee, | ) | FILED: APRIL 7, 1997 |
| | ) | |
| v. | ) | CUMBERLAND COUNTY |
| | ) | |
| MICHAEL DEAN BUSH, | ) | HON. LEON BURNS, JR., |
| JUDGE | | |
| | ) | |
| Appellant. | ) | NO. 03-S-01-9604-CC-00047 |

DISSENTING OPINION

The majority concludes that aggravating factor

(i)(6)[23] has been sufficiently demonstrated in the instant case.

---

[23](i) No death penalty shall be imposed but upon a unanimous finding
that the state has proven beyond a reasonable doubt the existence of one
(1) or more of the statutory aggravating circumstances, which are limited
to the following:

In my view, the evidence is not sufficient to warrant its application.  Because I find that this error more probably than not affected the jury's decision to impose the death sentence, I would vacate the sentence of death and remand this cause for a new sentencing hearing.

Although this is a close case, I do not find that the State presented sufficient evidence for the jury to conclude that Bush killed the victim in order to avoid arrest or prosecution for the robbery.  When the evidence is entirely circumstantial, as in this case, then that evidence must preclude every other reasonable theory or hypothesis except that which it tends to support, i.e., that the killing was, in fact, motivated by a desire to eradicate a witness.  <u>State v. Zirkle</u>, 910 S.W.2d 874, 882 (Tenn. Crim. App. 1995)(citing <u>Marable v. State</u>, 203 Tenn. 440, 313 S.W.2d 451, 456 (1958)).[24]

The majority relies in part on the fact that the defendant and the victim knew one another.  Such is not

---

. . . .

> (6)  The murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of the defendant or another.

Tenn. Code Ann. § 39-13-204(i)(6)(1991).

[24]Although <u>Zirkle</u> refers to the standard of proof required to establish guilt when the evidence against the defendant is entirely circumstantial, I think it is equally applicable here.

sufficient, without more, to establish the (i)(6) aggravating factor.  In many cases, the victim either knows the defendant or has observed the defendant sufficiently to be able to later identify that person.  This circumstance is so prevalent that to allow it to establish the (i)(6) aggravating factor would unduly and unconstitutionally enlarge the class of defendants subject to the death penalty.

Moreover, our prior application of the (i)(6) aggravator in similar cases has not been consistent.  See State v. Evans, 838 S.W.2d 185 (Tenn. 1992)(aggravating factor (i)(6) applied where defendant, a former employee, returned, robbed market, and killed a clerk whom he knew).  But see State v. Van Tran, 864 S.W.2d 465 (Tenn. 1993)(aggravating factor (i)(6) not applied where defendant, former employee, returned, robbed restaurant, and killed owner whom he knew).  State v. West, 767 S.W.2d 387 (Tenn. 1989)(aggravating factor (i)(6) applied where defendant and co-defendant were convicted of the murder of a girl who knew co-defendant and could identify defendant).  But see State v. Branam, 855 S.W.2d 563 (Tenn. 1993)(aggravating factor (i)(6) not applied where defendant and co-defendant were convicted for the murder of a woman who knew defendant and could identify co-defendant).

93

Because of the inconsistent application of the (i)(6) aggravating factor and the danger of unconstitutionally enlarging the class of defendants subject to the death penalty, I would hold that the fact that the victim knew the assailant, without more, is not sufficient to prove that the killing was in fact motivated by a desire to evade arrest or avoid prosecution. By requiring additional evidence, we would screen out those cases in which a defendant initially intended to commit a non-capital offense but for a reason other than witness elimination, escalated the conduct to include an unlawful killing.

In this case, the State's theory was that Bush killed Lefever so that she could not identify him as the individual who broke into her house and robbed her. From my review, however, there is substantial evidence that Bush did not kill Lefever in order to eliminate her as a witness to the burglary/robbery. First, Bush made no attempt to conceal the intended crime from his wife; rather, he told her that he was going to hit the old woman over the head and take her money. The majority finds it significant that the defendant withheld from his wife the name or address of the intended victim concluding that Bush wished to prevent her from "witnessing the burglary." However, there is no dispute that Bush told his wife of his intent to commit the burglary and asked her to drive him to the scene. In my view,

94

this evidence indicates that Bush was not concerned about concealing the burglary. I find that this testimony indicates that Bush simply did not want to implicate his wife in the crime. Hence, I find this evidence insufficient to support the majority's conclusion that the defendant killed the victim to eliminate her as a witness.

More to the point, Bush related versions of what happened to two fellow inmates who testified as witnesses for the State. The first testified that Bush told him that he had killed the victim when he could not find any money. The second testified that Bush told him that he killed the victim when he lost his temper after an argument erupted. In these two versions, Bush clearly identifies himself as the killer. Given this disclosure, there was no reason for him to lie about his motivation for the killing. In both versions, Bush killed Lefever because he was angry and frustrated. In my view, this evidence clearly indicates that Bush was not concerned about Lefever's ability to identify him as the burglar/robber when he killed her. This evidence raises, in the very least, a reasonable doubt as to whether the defendant was motivated by a desire to avoid arrest or prosecution.

We have previously held that the State does not have to prove that avoidance of arrest or prosecution was the defendant's sole or predominant motivation to establish the applicability of the (i)(6) aggravating factor. State v. Carter, 714 S.W.2d 241, 250 (Tenn. 1986). However, we should require that the State prove that a desire to avoid arrest or prosecution was at least a motivation for the crime. In my view, the State failed to carry that burden in this case.

To reiterate, I would restrict the application of the (i)(6) aggravating circumstance to cases where the evidence clearly establishes that the defendant was motivated by a desire to avoid arrest or prosecution by eliminating the witness. To illustrate, the (i)(6) aggravator was appropriately applied in State v. Smith, 868 S.W.2d 561 (Tenn. 1993)(victim killed while dialing 911); State v. McCormick, 778 S.W.2d 48 (Tenn. 1989)(undercover agent testified that defendant confessed that he killed victim to prevent her from "spilling her guts" about property defendant had stolen); State v. Adkins, 725 S.W.2d 660 (Tenn. 1987)(evidence that defendant eliminated the victim who was to testify against defendant for the shooting of defendant's girlfriend); and State v. Johnson, 632 S.W.2d 542 (Tenn. 1982)(defendant told friend that he was going to rob a market and that he intended to leave no witnesses).

96

In conclusion, I find that under the facts of this case, the evidence is not sufficient to establish the (i)(6) aggravating factor. I find also that the erroneous use of this aggravating factor more probably than not affected the jury's decision to impose the death sentence. Accordingly, I would vacate the sentence of death and remand the cause for a new sentencing hearing.

_____

ADOLPHO A. BIRCH, JR., Chief Justice